SYLLABUS

(This syllabus is not part of the opinion of the Court.  It has been prepared by the Office of the Clerk for the convenience of the reader.  It has been neither reviewed nor approved by the Supreme Court.  Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

## State v. Bobby Perry (A-34-14) (075114)

**Argued January 26, 2016 – Decided May 17, 2016**

**SOLOMON, J., writing for a unanimous Court.**

In this appeal arising from a prosecution for aggravated sexual assault, the Court considers the admissibility, under the New Jersey Rape Shield Law, N.J.S.A. 2C:14-7, of DNA evidence from the victim's clothing that did not belong to defendant, which he asserted would support his defense that a third party was responsible for the victim's injuries.

On August 1, 2009, at approximately 10:00 p.m., the victim visited defendant, whom she had been dating for about three weeks, at his sister's apartment.  She drank with him, his sister and others for several hours.  The others then left, leaving defendant and the victim alone, and they began to argue.  During the encounters that followed, the victim claimed that defendant assaulted her, including hitting her face and causing her to bleed, and engaged in multiple acts of sexual contact and intercourse with her against her will.  The victim further claimed that, during one of the episodes, defendant's sister returned home, and he told the victim to get dressed and act as though nothing had happened.  The victim complied, and the parties and defendant's sister then gathered together and spoke for some fifteen to twenty minutes.

When they were alone again, the victim claimed that defendant continued to engage her in sexual contact against her will, and attempted to assault her.  The victim finally left the apartment at approximately 5:00 a.m., and called her ex-boyfriend.  He picked her up and drove to a nearby police station, arriving at approximately 6:20 a.m.  The victim was transported to the hospital where she was treated for her injuries.  The victim later gave a sworn statement to the police, and identified defendant as her attacker.

Defendant was indicted for first-degree aggravated sexual assault, second-degree sexual assault, and third-degree aggravated assault.  On the eve of trial, defendant filed a Notice of Intent to Assert Evidence of Semen Source under the Rape Shield Law to admit DNA evidence from the semen stain found on the shorts that the victim was wearing on the night of the alleged assaults.  Defendant contended that the evidence was admissible to support his defense that the victim had consented to sexual intercourse and left the apartment uninjured, a third party -- allegedly her ex-boyfriend -- then raped and assaulted her, and she falsely accused defendant.  He further argued that admission of the DNA was not precluded by the Rape Shield Law.  The trial court denied defendant's motion, finding that the evidence was inadmissible under the Rape Shield Law because it was not relevant to the issue of consensual sex, and its low probative value was substantially outweighed by a danger of prejudice.  The trial proceeded, and defendant was found guilty of second-degree sexual assault and third-degree aggravated assault.  He was sentenced to imprisonment for eight years, with an eighty-five percent period of parole ineligibility.

Defendant appealed, and asserted that the trial court improperly excluded the DNA evidence, which prevented him from presenting a complete defense.  A divided Appellate Division panel reversed defendant's convictions, finding that the semen evidence was relevant to the third-party conduct defense that defendant had asserted, and was admissible under the liberal approach to the admission of evidence pertaining to third-party guilt that the courts in New Jersey have utilized.  The dissent concluded that the trial court properly applied the Rape Shield Law to exclude the DNA evidence, stating that it served only to establish that the victim engaged in sex with an unknown third party.

The State appealed as of right under Rule 2:2-1(a)(2) based on the dissent in the Appellate Division.

**HELD:** The semen found on the victim's clothing constitutes inadmissible evidence of sexual conduct under the Rape Shield Law, and was not relevant to defendant's defense of third-party guilt.  Any probative value of the

evidence is substantially outweighed by its prejudicial effect.

1.  When evidentiary rulings of a trial court are challenged on appeal, the appellate court should uphold the trial court's determination absent a showing of an abuse of discretion demonstrating a clear error of judgment.  Under this standard, an appellate court should not substitute its own judgment for that of the trial court unless the trial court's ruling was so wide of the mark that a manifest denial of justice occurred.  (p. 13)

2.  The admissibility of evidence of a victim's prior sexual conduct is governed by the Rape Shield Law, which was enacted to restrict a defendant's ability to present evidence of the victim's past sexual conduct.  The Rape Shield Law is designed to deter unscrupulous foraging for information about the victim, and does not permit the introduction of evidence of the victim's past sexual conduct to cast the victim as promiscuous or of low moral character.  To encourage the reporting of sexual abuse, the law assures victims that they will not be subject to untoward invasions of privacy through excessive and collateral cross-examination of prior sexual conduct.  (pp. 14-15)

3.  While protection of the victim's privacy interests is a paramount purpose of the Rape Shield Law, the Court has consistently refused to construe the law in a way that would impair a defendant's constitutional right to a fair trial.  The Court has therefore departed from the literal language of the Rape Shield Law's standard for the admissibility of evidence of a victim's prior sexual conduct, which requires a showing that the evidence is relevant and highly material, and that its probative value substantially outweighs its collateral nature or prejudicial effect.  Instead, the Court has held that such evidence is subject to a two-step analysis.  First, the trial court must determine whether evidence within the scope of the Rape Shield Law is relevant and necessary to resolve a material issue in light of the other available evidence.  Second, the court must decide whether, under N.J.R.E. 403, the probative value of the contested evidence outweighs the prejudicial effect to the victim.  The determination whether evidence is admissible under this test is inherently fact-sensitive and dependent on the particular facts of the case.  (pp. 15-20)

4.  In asserting that the trial court's exclusion of the DNA evidence violated his constitutional right to a fair trial, defendant contends that the ruling impermissibly encroached upon his ability to show third-party guilt, and thereby deprived him of the ability to present a complete defense.  A complete defense includes the right to introduce evidence of third-party guilt if the proposed proof has a rational tendency to engender a reasonable doubt regarding an essential element of the State's case.  A defendant cannot seek to introduce evidence of some adverse event and leave its connection with the case to conjecture.  Instead, the evidence must be capable of demonstrating some link between the third-party evidence and the victim or the crime.  (pp. 20-22)

5. The semen stain fits within the definition of sexual conduct under the Rape Shield Law.  Accordingly, the admissibility analysis turns to the two-prong test stated above.  Applying the first prong of the analysis requiring proof that the evidence is relevant, there is nothing in the record to indicate when the semen was deposited on the victim's clothing, and it was also never linked to the victim's ex-boyfriend.  Thus, the proffered evidence fails to support the defense of third-party guilt, and it is irrelevant to the defense that the parties' sexual contact was consensual.  The trial court's exclusion of the evidence therefore did not constitute an abuse of discretion or a due process violation.  (pp. 23-28)

6.  Under the second prong of the analysis, which requires that the Court weigh the probative value of the evidence against its prejudicial effect, the minimal probative value of the evidence is outweighed by its potential for prejudice to the victim.  It would have been an unwarranted invasion into the victim's privacy to confront her at trial with evidence of sexual conduct with someone other than the defendant.  Allowing such an examination of the victim's past conduct, particularly where the probative value of the evidence and its relevance to the defense is insignificant, is the precise matter that the Rape Shield Law is intended to prevent.  (pp. 28-30)

The judgment of the Appellate Division is **REVERSED** and defendant's convictions are reinstated.

**CHIEF JUSTICE RABNER; JUSTICES LaVECCHIA, ALBIN and PATTERSON; and JUDGE CUFF (temporarily assigned) join in JUSTICE SOLOMON'S opinion.  JUSTICE FERNANDEZ-VINA did not participate.**

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

        v.

BOBBY PERRY (a/k/a BOBBY
PENNY),

    Defendant-Respondent.


        Argued January 26, 2016 – Decided May 17, 2016

        On appeal from the Superior Court, Appellate
        Division.

        Sara M. Quigley, Deputy Attorney General,
        argued the cause for appellant (John J.
        Hoffman, Acting Attorney General of New
        Jersey, attorney).

        Elizabeth C. Jarit, Assistant Deputy Public
        Defender, argued the cause for respondent
        (Joseph E. Krakora, Public Defender,
        attorney).

        Lawrence S. Lustberg argued the cause for
        amicus curiae Association of Criminal
        Defense Lawyers of New Jersey (Gibbons,
        attorneys; Mr. Lustberg and Joseph A. Pace,
        on the letter brief).


    JUSTICE SOLOMON delivered the opinion of the Court.

    Defendant was charged with sexually and physically

assaulting a woman he had been casually dating.  Prior to trial,

defendant filed a motion under the New Jersey Rape Shield Law,

N.J.S.A. 2C:14-7 (Rape Shield Law), to admit DNA evidence of an unidentified semen stain, which did not belong to defendant, found on the shorts that the victim was wearing on the night of the assault.  Although it was never determined to whom the semen belonged or when it was left on the victim's shorts, defendant argued that the evidence supported his defense that the victim was still romantically involved with her ex-boyfriend, providing motive for the ex-boyfriend to assault the victim and for the victim to fabricate the charges.

The trial court denied defendant's motion, finding that the DNA evidence was irrelevant to defendant's theory of third-party guilt, precluded by the Rape Shield Law, and, in any event, inadmissible because "the low probative value of the evidence [wa]s substantially outweighed by a danger of prejudice." Following a jury trial, defendant was convicted of second-degree sexual assault and third-degree aggravated assault.

In a split decision, the Appellate Division reversed and remanded for a new trial, holding that the DNA evidence was relevant to prove defendant's theory that the victim's ex-boyfriend perpetrated the assault and was, therefore, admissible because "[e]ven if there is no evidence linking another specific suspect to the crime, 'courts have recognized that evidence that tends to create reasonable doubt that someone else, generically, rather than defendant, committed the offense, is admissible.'"

2

The dissent, conversely, concluded that "the trial court properly applied the Rape Shield Law to exclude [the DNA] evidence proffered by defendant that served only to establish that the victim engaged in sex with an unknown third party."

We conclude that the semen found on the victim's shorts constituted inadmissible evidence of "sexual conduct" within the meaning of the Rape Shield Law, and was not relevant to defendant's third-party guilt defense. We further find that any probative value of the evidence is substantially outweighed by its prejudicial effect. We, therefore, reverse the judgment of the Appellate Division and reinstate defendant's convictions.

## I.

## A.

The trial record reveals the following. In 2009, defendant met and began dating Sara.[1] At the time, defendant lived with his sister, Byinnah Jones (Jones),[2] in an apartment in Union where Jones' two children and husband also resided. Defendant and Sara dated for about three weeks and had engaged in consensual sex seven or eight times prior to the incident.

---

[1] Consistent with the Appellate Division, we use a pseudonym for the victim due to the sexual nature of the crimes.

[2] Jones and defendant are not biological siblings, but refer to each other as brother and sister.

3

On August 1, 2009, at about 10:00 p.m., Sara went to Jones' apartment to see defendant. When she arrived at the residence, Sara joined defendant, Jones, Jones' husband, and Jones' cousin on the back sun porch. Around midnight, after being together and drinking for a few hours, Jones and her cousin left the apartment to attend a party. Jones' husband and children were asleep in the back of the apartment. Shortly after Jones and her cousin left, defendant and Sara began arguing.

According to Sara, during the argument defendant struck her from behind on the right side of her face with a closed fist. After being hit, Sara fell off of the chair she was seated in and felt her tooth become loose and her mouth fill with blood. Defendant then grabbed Sara and pulled her into a bathroom where she saw her bloodied face in the mirror and began to scream. Defendant muffled and choked Sara and told her that if she did not stop screaming, he would slam her head against the wall. Sara complied, and defendant took her clothes off, cleaned the blood off of her shoulders and chest, and placed her in the shower. While in the shower, defendant repeatedly threatened to harm her and her family if she did not comply with his instructions. She further claimed that before permitting her to exit the shower, defendant forced her to chug beer and other alcohol, and digitally penetrated her vagina.

4

Defendant then forced Sara onto the sun porch, where he inserted his penis into her vagina against her will. This occurred for an estimated twenty to thirty minutes, and ceased when defendant heard Jones returning to the apartment.[3] He then told Sara to put on some clothes and act like nothing happened. Sara complied and Jones joined the pair on the porch. Sara, defendant, and Jones spoke for about fifteen to twenty minutes after which Jones left the room.[4] Defendant then ordered Sara to the basement where he washed her clothes and the bath mats. While in the basement, defendant again vaginally penetrated Sara against her will.

Following the assault in the basement, defendant brought Sara back upstairs and directed her into the shower. This time, according to Sara, defendant also got into the shower and attempted to assault her once more, but she resisted and fell. When she fell, Sara screamed and hit the side of the bathtub with her hand. The noise apparently woke up Jones and prompted her to knock on the bathroom door to see if everything was okay. Defendant replied that Sara "had too much to drink" and had "c[o]me into a spell."

---

[3] Sara stated that defendant was not wearing a condom during the assault, and that she was unsure whether or not he ejaculated.

[4] Jones stated that when she returned from the party she did not notice any physical injuries on Sara's face.

5

Sara claimed that she finally left the apartment at around 5:00 a.m. and that defendant followed her to the end of the block. In order to get away from him, Sara hid in an opening between a building and a yard. Once defendant left the area, Sara called her ex-boyfriend, Hakim Wilkins (Wilkins). Wilkins, who was aware that she had been dating defendant, picked up Sara in his car and took her to the nearby Maplewood Police Department, arriving at about 6:20 a.m.

At the station, Sara spoke briefly to a sergeant who immediately took note of her facial injuries. Sara then went to the hospital where she was examined by a sexual assault nurse and received eleven stitches to her lip. Upon her release, Detective Fuentes transported Sara to the Union Township Police Department.[5] Once there, Sara gave a sworn statement detailing the events of the previous night, and identified defendant as her attacker using a photo array.

Thereafter, Detective Fuentes and other investigators went to Jones' apartment and searched the back sun porch, bathroom, and basement, but found no evidence of blood or bodily fluids, and no evidence that anyone had tried to "clean up" the scene. After speaking with Sara, investigators returned to Jones'

---

[5] Once Sara told the Maplewood Police Sergeant the location of Jones' apartment, the Sergeant realized that the alleged assaults occurred in the Township of Union, not Maplewood, and notified the Union Police Department of the incident.

apartment the next day and found blood on the back side of a chair on the sun porch.

The blood sample from the chair, the DNA evidence from the sexual-assault kit, and the clothing Sara wore on the night of the assault were tested. While no DNA matched defendant, testing confirmed that the blood from the chair and the blood on Sara's t-shirt both belonged to Sara. There was no evidence of semen from the samples taken at the hospital. The only semen found was on Sara's shorts and was from an unidentifiable third party.

Defendant also gave a statement to police in which he admitted to having sexual intercourse with Sara, but claimed that it was consensual.[6]

### B.

A Union County Grand Jury indicted defendant on one count each of first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(3), second-degree sexual assault, N.J.S.A. 2C:14-2(c)(1), and third-degree aggravated assault, N.J.S.A. 2C:12-1(b)(7).

On the eve of trial, defendant filed a Notice of Intent to Assert Evidence of Semen Source under the Rape Shield Law to admit DNA evidence from the semen stain found on the shorts Sara

---

[6] Defendant's statement was not introduced at trial.

7

was wearing the night of the assaults. The following day, the trial court heard argument on the motion.[7]

Defendant argued that the sperm found on Sara's shorts did not constitute inadmissible evidence of sexual conduct under the Rape Shield Law and was admissible to support his defense that Sara consented to sexual intercourse and left the apartment uninjured. Defendant further asserted that the DNA evidence was relevant to show that a third party -- allegedly Wilkins -- raped and assaulted Sara after she left Jones' apartment and that Sara falsely accused defendant in order to appease that third party. Without this evidence, defendant claimed, he would not be able to present a complete defense. The State, conversely, argued that the Rape Shield Law precluded admission of the DNA evidence and that evidence of unidentified semen, without any indication that it was left on Sara's shorts the night of the assault, was neither relevant nor material to whether Sara consented to having sex with defendant or to whether her injuries occurred before or after she left Jones' apartment.

After hearing argument and reviewing relevant case law, the trial court determined that the Rape Shield Law prohibited the

---

[7] The trial court also heard argument on the State's application to exclude evidence of Sara's previous consensual sexual relationship with defendant, which the court later denied.

admission of the semen stain because it was not relevant to whether Sara consented to having sex with defendant, nor did it support defendant's third-party guilt defense. The trial court further found that the "low probative value of the evidence [wa]s substantially outweighed by a danger of prejudice," and, therefore, denied defendant's motion.[8]

The case then proceeded to trial. The State called Sara, who testified that defendant physically and sexually assaulted her repeatedly at Jones' apartment. Several law enforcement officials also took the stand and testified regarding their investigation.[9] Defendant did not testify and only called one witness, Jones, who testified that upon returning from the party she spoke with both Sara and defendant and that Sara left the apartment uninjured on the night of the assaults.

At the conclusion of the trial, the jury convicted defendant of second-degree sexual assault and third-degree aggravated assault. The jury acquitted defendant of first-degree aggravated sexual assault. Thereafter, the trial court sentenced defendant to concurrent terms of eight years of

---

[8] Defendant's emergent application to file an interlocutory appeal from the denial of his motion to admit the DNA evidence from the semen stain was denied by the Appellate Division.

[9] Sara's mother also testified, as did the dentist who treated Sara for her injuries and a DNA analyst employed by the Union County Prosecutor's Office.

imprisonment for second-degree sexual assault, with an eighty-five percent period of parole ineligibility pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2(a), and three years of imprisonment for third-degree aggravated assault. Defendant was also sentenced to parole supervision for life, pursuant to Megan's Law, N.J.S.A. 2C:43-6.4.

Defendant appealed, claiming, among other things,[10] that the trial court erroneously prohibited him from admitting the evidence of another man's semen found on Sara's shorts the night of the assaults, which prevented him from presenting a complete defense, in violation of his federal and state constitutional rights to confrontation, compulsory process, and due process.

A divided Appellate Division panel reversed defendant's convictions, finding that the semen evidence was relevant to support defendant's assertion that Wilkins committed the assaults and was admissible given New Jersey's consistently "liberal approach" to the admission of evidence pertaining to third-party guilt. In the majority's view, because the semen

_____

[10] Defendant also claimed that: 1) the trial court erred by allowing the admission of "improper" 404(b) evidence regarding defendant's alleged hatred of women and previous gang membership; 2) the State committed prosecutorial misconduct by purportedly "elaborating on the virtues of the victim, disparaging the defense witness, and inflaming the passions of the jury"; 3) the cumulative effects of the errors denied him a fair trial; and 4) the trial court failed "to conduct a proper weighing of the aggravating and mitigating factors" at sentencing.

10

evidence had a "tendency to create a reasonable doubt that [defendant] committed the crime" and could possibly "discredit[] Sara, and show[] a possible motive [for her] to lie . . . it meets the minimum threshold our Court has set for the admission of [third-party guilt] evidence."

Judge Guadagno dissented, finding that the trial court properly applied the Rape Shield Law in ruling that the evidence was irrelevant to whether the victim consented and, further, provided no support for defendant's claim of third-party guilt. Noting that "[o]ur case law consistently rejects third-party evidence that is based on mere conjecture[,]" Judge Guadagno found that "[s]emen on a victim's clothing that could have been deposited by any of her sexual partners during the weeks or even months prior to the incident does not, as claimed by the majority, tend to support the assertion that someone other than defendant committed the assault." Moreover, according to Judge Guadagno, the probative value of the DNA evidence was not only "negligible and . . . substantially outweighed by its prejudice," but also "exactly the type of embarrassing and unwarranted exploration of the victim's character and conduct that the Rape Shield Law was designed to exclude."

The Appellate Division subsequently granted the State's motion to stay the judgment. Based on the dissent, the State appealed to this Court as of right. R. 2:2-1(a)(2).

11

C.

The State argues that the trial court properly excluded, under the Rape Shield Law, the DNA evidence from the semen stain because it was not relevant to whether Sara and defendant engaged in consensual sexual intercourse on the night of the assaults or supportive of defendant's third-party guilt defense. Here, because the semen was not linked to the third party -- Wilkins -- and there was no evidence that it was left on the victim's shorts at or near the time of the crime, the State asserts that the evidence shows only that the victim had a sexual encounter with an unidentified person at some unspecified time, "leaving its connection to the crime as mere conjecture."

Defendant maintains that the trial court prevented him from presenting a complete defense by improperly excluding evidence relevant to third-party guilt. According to defendant, the Appellate Division correctly held that the DNA evidence of the semen stain was admissible because it was relevant to his theory that Wilkins assaulted Sara on the night in question and that Sara was motivated to fabricate the charges against defendant in order to protect her relationship with Wilkins.

Amicus Association of Criminal Defense Lawyers of New Jersey (ACDL-NJ) argues that the Rape Shield Law does not mandate exclusion of evidence of past sexual conduct introduced to establish third-party guilt. ACDL-NJ contends that the

12

Appellate Division correctly held that a semen stain on the victim's shorts, introduced to show that she was in a relationship with another man and therefore had a motive to lie about being assaulted by defendant, was sufficiently probative to require admission under the Confrontation and Compulsory Process Clauses.

II.

A.

We begin by acknowledging our deferential standard for reviewing a trial court's evidentiary rulings, which should be upheld "'absent a showing of an abuse of discretion, i.e., there has been a clear error of judgment.'" State v. Brown, 170 N.J. 138, 147 (2001) (quoting State v. Marrero, 148 N.J. 469, 484 (1997)). An appellate court applying this standard should not substitute its own judgment for that of the trial court, unless "the trial court's ruling 'was so wide of the mark that a manifest denial of justice resulted.'" Marrero, supra, 148 N.J. at 484 (quoting State v. Kelly, 97 N.J. 178, 216 (1984)); see also State v. J.A.C., 210 N.J. 281, 295 (2012). That standard governs our instant analysis of whether the trial court erred in excluding evidence of the semen stain on Sara's shorts pursuant to the Rape Shield Law and, thereby, deprived defendant of "[t]he constitutional right to present a defense . . . that someone else committed the crime." State v. Fortin, 178 N.J.

540, 590 (2004) (citing State v. Jimenez, 175 N.J. 475, 486 (2003), and State v. Koedatich, 112 N.J. 225, 297 (1988), cert. denied, 488 U.S. 1017, 109 S. Ct. 813, 102 L. Ed. 2d 803 (1989)).

The introduction of evidence of a victim's prior sexual conduct is governed by New Jersey's Rape Shield Law, N.J.S.A. 2C:14-7, which was enacted in 1978 to "place[ ] restrictions on a defendant's ability to introduce evidence of the rape victim's past sexual conduct."  Assembly Judiciary, Law and Public Safety Committee, Statement to Assembly Bill No. 677, at 1 (Jan. 20, 1994), reprinted in N.J.S.A. 2C:14-7 (2005).  In this way, the Rape Shield Law "is designed 'to deter the unwarranted and unscrupulous foraging for character-assassination information about the victim' and 'does not permit introduction of evidence of the victim's past sexual conduct to cast the victim as promiscuous or of low moral character.'"  State v. Schnabel, 196 N.J. 116, 128 (2008) (quoting State v. Garron, 177 N.J. 147, 165 (2003), cert. denied, 540 U.S. 1160, 124 S. Ct. 1169, 157 L. Ed. 2d 1204 (2004)).

The Rape Shield Law defines "sexual conduct" as "any conduct or behavior relating to sexual activities of the victim, including but not limited to previous or subsequent experience of sexual penetration or sexual contact, use of contraceptives, sexual activities reflected in gynecological records, living

14

arrangement and life style." N.J.S.A. 2C:14-7(f).  Thus, in order "to encourage the reporting of sexual abuse by assuring victims that they will not be subject to untoward invasions of privacy through excessive and collateral cross-examination of their prior sexual conduct," Garron, supra, 177 N.J. at 165, the Rape Shield Law proscribes that such evidence is admissible only if it is "relevant and highly material, meets the requirements of subsections (c) and (d) of [the statute]," and its probative value "substantially outweighs its collateral nature or the probability that its admission will create undue prejudice, confusion of the issues, or unwarranted invasion of the privacy of the victim."  N.J.S.A. 2C:14-7(a).[11]  Under N.J.S.A. 2C:14-7(c) and (d), evidence of past sexual conduct is only relevant if "it is material to proving the source of semen, pregnancy or disease[,]" N.J.S.A. 2C:14-7(c), or "if it is probative of whether a reasonable person, knowing what the defendant knew at the time of the alleged offense, would have believed that the alleged victim freely and affirmatively" consented.  N.J.S.A. 2C:14-7(d).[12]

---

[11] This statutory standard was later modified by Budis and Garron, as will be seen.

[12] These examples of relevance under the Rape Shield Law are illustrative not exhaustive.  State v. Scherzer, 301 N.J. Super. 363, 412 (App. Div.), certif. denied, 151 N.J. 466 (1997).

While the protection of the "privacy interests of the victim" is certainly paramount to its purpose, the Rape Shield Law also aims to "'ensur[e] a fair determination of the issues bearing on the guilt or innocence of the defendant.'" State v. P.S., 202 N.J. 232, 261 (2010) (quoting Garron, supra, 177 N.J. at 165). As such, we have consistently refused to construe the Rape Shield Law in a way that would impinge on a defendant's constitutional right to a fair trial. This right includes "a meaningful opportunity to present a complete defense" as well as a defendant's right to confront the witnesses against him and to have compulsory process for obtaining witnesses in his favor. See J.A.C., supra, 210 N.J. at 298 (noting that "the constitutional rights of confrontation and compulsory process have long been recognized as essential to the due process right to a fair opportunity to defend against the State's accusations, and thus [are] among the minimum essentials of a fair trial"); Garron, supra, 177 N.J. at 168-69 (same); see also State v. Budis, 125 N.J. 519, 530-31 (1991).

In Budis and Garron we addressed "the tension between [a] defendant's right to confrontation and the compulsory process of witnesses, and the victim's right to be free from an unnecessary invasion of her privacy" under the Rape Shield Law. Garron, supra, 177 N.J. at 153; Budis, supra, 125 N.J. at 531. In Budis, we instructed that "[b]ecause confrontation is

16

fundamental to a fair trial, . . . its 'denial or significant diminution calls into question the ultimate integrity of the fact finding process and requires that the competing interests be closely examined.'" Budis, supra, 125 N.J. at 532 (citing Chambers v. Mississippi, 410 U.S. 284, 295, 93 S. Ct. 1038, 1046, 35 L. Ed. 2d 297, 309 (1986)). Therefore, to ensure that application of the Rape Shield Law does not unduly trample on a criminal defendant's constitutional rights to confrontation and compulsory process, this Court in Budis "departed from the literal language of N.J.S.A. 2C:14-7(a), which requires evidence of a victim's previous sexual conduct to be 'relevant and highly material,' and to have probative value that 'substantially outweighs' its collateral nature or prejudicial effect." J.A.C., supra, 210 N.J. at 298. Instead, we held in Budis that such evidence should be admitted if it is "'relevant to the defense . . . [and] its probative value outweighs its prejudicial effect.'" Ibid. (quoting Budis, supra, 125 N.J. at 532).

In Garron, we revisited "the constitutional standard enunciated in Budis" and, again, emphasized the need to "construe the [Rape Shield Law] so that its reach does not exceed constitutional limits." Garron, supra, 177 N.J. at 172. In doing so, "[w]e reaffirm[ed] the test in Budis that evidence relevant to the defense that has probative value outweighing its

17

prejudicial effect must be placed before the trier of fact"[13] and that "evidence that is relevant and necessary to prove the defense of consent is not excluded under the [Rape Shield Law]." Id. at 172-73.

Thus, under our case law interpreting the Rape Shield Law, determining the admissibility of evidence of a victim's prior sexual conduct requires a two-step analysis. Garron, supra, 177 N.J. at 172-73; Budis, supra, 125 N.J. at 532-34. The first step requires the trial court to ascertain whether evidence encompassed under the Rape Shield Law is relevant and necessary to resolve a material issue in light of the other evidence that is available to address that issue. J.A.C., supra, 210 N.J. at 299; Budis, supra, 125 N.J. at 532. "Relevant evidence" is defined by N.J.R.E. 401 as "'evidence having a tendency in reason to prove or disprove any fact of consequence to the determination of the action.'" State v. Jenewicz, 193 N.J. 440, 457 (2008) (quoting N.J.R.E. 401). This determination focuses on "'the logical connection between the proffered evidence and a fact in issue.'" Schnabel, supra, 196 N.J. at 130-31 (quoting State v. Williams, 190 N.J. 114, 123 (2007)).

---

[13] This test is nearly identical to the analysis trial courts employ when determining the admissibility of evidence, generally, under our evidentiary rules. See N.J.R.E. 403.

If found to be relevant, the court must then, as the second step, decide whether, under N.J.R.E. 403, the probative value of the contested evidence outweighs the prejudicial effect to the victim in the context of the Rape Shield Law. Budis, supra, 125 N.J. at 532. Generally, the "probative value" of evidence is determined by "its tendency to establish the proposition that it is offered to prove." Garron, supra, 177 N.J. at 167 n.2 (citing State v. Wilson, 135 N.J. 4, 13 (1994)). Under the Rape Shield Law, the probative value of a victim's prior sexual conduct "'depends on clear proof that [the conduct] occurred, that [it is] relevant to a material issue in the case, and that [it is] necessary to a defense.'" J.A.C., supra, 210 N.J. at 300 (quoting Budis, supra, 125 N.J. at 533).

The prejudice contemplated by the Rape Shield Law includes the trauma to the victim, the degree to which the evidence sought to be admitted would invade the victim's privacy, the "impact of a given ruling on a victim reporting sexual abuse," as well as the need to guard victims from excessive cross-examination and prevent undue jury confusion. Ibid. Given that a "trial court must weigh the relevance of the proffered evidence, its necessity to the defense, and its apparent veracity against its potential to humiliate the victim, invade her privacy, and confuse the jury[,]" State v. J.D., 211 N.J. 344, 358 (2012), "[t]here is . . . substantial overlap between

19

the relevancy determination [called for] in the first step of the [analysis], and the measure of the 'probative value' for purposes of the second step."  J.A.C., supra, 210 N.J. at 300.

The determination of whether evidence of a victim's prior sexual conduct is admissible "is exquisitely fact-sensitive" and "depends on the facts of each case."  J.D., supra, 211 N.J. at 358 (citation and quotation marks omitted); see also Budis, supra, 125 N.J. at 533.  When evidence of prior sexual conduct satisfies the two-step analysis set forth in Budis and Garron, it is admissible and courts are required to "impose case-specific parameters, where appropriate, to any such evidence admitted."  J.A.C., supra, 210 N.J. at 301.

### B.

Because defendant claims that the trial court's exclusion of the DNA evidence impermissibly encroached upon the presentation of his theory of third-party guilt and thereby deprived him of "a meaningful opportunity to present a complete defense," a brief review of our jurisprudence surrounding third-party guilt is instructive.

We have long recognized that "by implication, a complete defense includes a criminal defendant's right to introduce evidence of third-party guilt 'if the proof offered has a rational tendency to engender a reasonable doubt with respect to an essential feature of the State's case.'"  State v. Cotto, 182

20

N.J. 316, 332 (2005) (quoting Fortin, supra, 178 N.J. at 591); see also State v. Sturdivant, 31 N.J. 165, 179 (1959), cert. denied, 362 U.S. 956, 80 S. Ct. 873, 4 L. Ed. 2d 873 (1960). "That standard does not require a defendant to provide evidence that substantially proves the guilt of another, but to provide evidence that creates the possibility of reasonable doubt." Cotto, supra, 182 N.J. at 332 (citing Fortin, supra, 178 N.J. at 591). Indeed, even if there is no evidence linking another specific suspect to the crime, we "have recognized that evidence that tends to create reasonable doubt that someone else, generically, rather than defendant, committed the offense, is admissible." State v. Loftin, 146 N.J. 295, 345 (1996) (citing State v. Jorgensen, 241 N.J. Super. 345, 351 (App. Div.), certif. denied, 122 N.J. 386 (1990)).

The concern, of course, is "the ease in which unsupported claims may infect the process." Ibid. As such, a defendant cannot simply seek to introduce evidence of some hostile or indecent event and "leave its connection with the case to mere conjecture." Sturdivant, supra, 31 N.J. at 179. Rather, the evidence a defendant seeks to admit in support of a third-party guilt defense must be capable of demonstrating "some link between the [third-party] evidence and the victim or the crime." Koedatich, supra, 112 N.J. at 301; see also Sturdivant, supra, 31 N.J. at 179 ("Somewhere in the total circumstances there must

21

be some thread capable of inducing reasonable men to regard the event as bearing upon the State's case."). The decision to admit or exclude evidence of third-party guilt is "particularly fact-sensitive" and rests within the trial court's discretion. Loftin, supra, 146 N.J. at 345 (quoting Koedatich, supra, 112 N.J. at 300); see also Cotto, supra, 182 N.J. at 333.

III.

A.

With these standards in mind, we must determine whether the evidence in this case that defendant sought to be admitted, notwithstanding the Rape Shield Law, was relevant to defendant's third-party guilt defense, and if so, whether its probative value outweighed its prejudicial effect. In making this determination, we are mindful of both the underlying purpose of the Rape Shield Law and the deferential standard by which we review a trial court's evidentiary rulings. See J.A.C., supra, 210 N.J. at 301 ("We review the trial court's evidentiary ruling, entitled to substantial deference under the 'abuse of discretion' standard of review, in light of the Legislature's objective in enacting N.J.S.A. 2C:14-7 and this Court's construction of the statute.").

Here, the trial court denied defendant's motion to admit the DNA evidence of the semen stain, finding that it was irrelevant to prove consent, which was the material issue in

22

this case, and did not support defendant's theory of third-party guilt. The trial court further found that the low probative value of the evidence was outweighed by the danger of prejudice. On appeal, the Appellate Division held that the trial court erred in excluding the unidentified semen evidence because it was relevant to prove defendant's theory of third-party guilt. We disagree.

Our inquiry begins by determining whether the semen stain constitutes "sexual conduct" under the Rape Shield Law. N.J.S.A. 2C:14-7(f) broadly defines "sexual conduct" as "any conduct or behavior relating to sexual activities of the victim, including but not limited to previous or subsequent experience of sexual penetration or sexual contact . . . ." Here, evidence of semen found on the victim from an unidentified third party fits squarely within that broad definition. Accordingly, we must turn to the two-pronged analysis for determining the admissibility of evidence of prior sexual conduct set forth in Budis, supra, 125 N.J. at 532-34, and Garron, supra, 177 N.J. at 172-73.

As stated above, the first step of that analysis requires the trial court to determine whether evidence covered by the Rape Shield Law is relevant and necessary to resolve a material issue, taking into account the other evidence that is available to address that issue. J.A.C., supra, 210 N.J. at 299; Budis,

23

supra, 125 N.J. at 532. Defendant contends here, and maintained at trial, that evidence of an unknown man's semen deposited on Sara's shorts was relevant to support his theory that Sara was assaulted by her ex-boyfriend, Wilkins, and that she fabricated the charges against defendant in order to appease Wilkins, to whom she was "romantically linked." To support this theory, defendant relies, in part, upon the undisputed fact that Sara left defendant around 5 a.m., did not arrive at the police station, located a few blocks away, until approximately 6:20 a.m., and was unable to explain what occurred during this period of time. In addition, defendant points out that he presented a witness, Jones, who testified that she did not see any physical injuries on Sara when Sara left the apartment on the night in question.

At trial, defense counsel cross-examined Sara extensively about her relationship with Wilkins and about the gap in time between when she left Jones' apartment and arrived at the police station. In response, Sara testified that she had been talking to Wilkins "[o]ff and on" and that he was a "prior boyfriend" who was "dating someone else" at the time of the sexual assault. Sara also acknowledged that Wilkins was the only person who could corroborate that she was injured when she left defendant's apartment. On redirect, Sara insisted she did not have any romantic feelings towards Wilkins at the time, but admitted that

24

even though she and Wilkins had broken up, "he was still [her] best friend." Additionally, defense counsel was able to elicit from Sara's mother that Wilkins and Sara had resumed their relationship by the time of trial. All of this evidence was relevant to defendant's third-party guilt defense. Indeed, it linked Wilkins to the assaults in both time and place -- according to Sara's own testimony, Wilkins was at or near the scene of the assaults when he picked Sara up by Jones' apartment and was the only person with Sara between the time of the incident and her reporting of the assaults to police. The same cannot be said for the DNA evidence of the semen stain.

Significantly, the semen found on Sara's shorts was never linked to Wilkins, the alleged third party. Moreover, there is nothing in the record to indicate when the semen was deposited onto Sara's shorts; it may have been left weeks or months before the sexual assault that is the subject of this appeal. In essence, all the contested evidence shows is that some unknown individual engaged in a sexual act with Sara at some unknown time. As Judge Guadagno stated in his dissent here, we fail to see how "[s]emen on a victim's clothing that could have been deposited by any of her sexual partners during the weeks or even months prior to the incident [tends to support] . . . the assertion that someone other than defendant committed the assault." Surely, without proof that the semen is in any way

related to the crime here, the DNA evidence of the semen stain on Sara's shorts was not relevant to the issue the jury had to decide -- namely, whether Sara was raped and assaulted by defendant or whether she consented to having sex with defendant and was later assaulted by Wilkins. See Schnabel, supra, 196 N.J. at 130 (stating that relevancy analysis focuses on "the logical connection between the proffered evidence and a fact in issue"). Thus, because the existence of the semen stain on Sara's shorts has no "tendency in reason to prove or disprove any fact of consequence" in the case at bar, N.J.R.E. 401, it was inadmissible under the N.J.R.E. 401 relevancy standard at the heart of the first prong of the Garron/Budis analysis. See Garron, supra, 177 N.J. at 176.

Nor do we agree with the Appellate Division majority's conclusion that the unidentified semen stain "had a rational tendency to engender a reasonable doubt with respect to an essential feature of the State's case," Loftin, supra, 146 N.J. at 345, and was thus admissible under our "liberal approach" on the admission of evidence pertaining to third-party guilt. Testimony concerning third-party guilt is not admissible unless there is evidence linking a third party to the crime. Ibid. In other words, we will not upend a trial court's decision to exclude purported third-party guilt evidence when, as here, the evidence proffered did no more than "prove some hostile event

26

and [left] its connection with the case to mere conjecture." Koedatich, supra, 112 N.J. at 301 (citation omitted). Indeed, it bears repeating that the semen had no apparent connection to this case other than the fact that the victim was wearing those shorts on the night of the incident.

While defendant maintains that "[e]vidence that Sara and Wilkins [were romantically linked and] had sex within a considerable window of time prior to the incident would have been relevant to Sara's motive to fabricate the charges, and to Wilkins' motive to assault Sara," there is no evidence of record that the semen stain is connected to the time period in question, or the alleged third party, Wilkins. Thus, the proffered evidence was irrelevant to defendant's consent defense, fails to support the defense of third-party guilt, and was, therefore, properly excluded. See Fortin, supra, 178 N.J. at 598 ("Reasonable doubt cannot arise from pure conjecture."); see also Koedatich, supra, 112 N.J. at 305 (finding that it is insufficient for defendant's proffered evidence of third-party guilt to simply advance "possible ground of suspicion against another person").

In sum, because the evidence was not relevant to whether Sara consented to have sex with defendant, or whether a third party perpetrated the assaults, it follows that it was not "necessary to a fair determination of the issues" and, thus, its

27

exclusion by the trial court did not amount to an abuse of discretion or a due process violation.  Garron, supra, 177 N.J. at 171.

                                    B.

For the sake of completeness, we will briefly discuss the second prong of the analysis set forth in Budis and Garron, which requires the trial court to weigh the probative value of the contested evidence against its prejudicial impact.  Here, the trial court found that, notwithstanding the irrelevancy of the semen evidence to the defense, "the low probative value of the evidence is substantially outweighed by a danger of prejudice."  The Appellate Division, conversely, determined that the evidence of another man's semen on Sara's shorts has a tendency to establish that someone else committed the assault, and if offered for that limited purpose, the likelihood of prejudice to the victim is outweighed by its probative value.  Again, we disagree.

First, as previously discussed, the mere existence of a semen stain on Sara's shorts, without proof of when it was deposited or who deposited it, is irrelevant to the issue of consent and insufficient to support defendant's third-party guilt defense.  See J.A.C., supra, 210 N.J. at 300 (noting that "[t]he probative value of sexual conduct covered by N.J.S.A. 2C:14-7 'depends on clear proof that [the conduct] occurred,

28

that [it is] relevant to a material issue in the case, and that [it is] necessary to a defense'" (quoting Budis, supra, 125 N.J. at 533)); see also Garron, supra, 177 N.J. at 167 n.2 (reaffirming that the "probative value" of evidence is "its tendency to establish the proposition that it is offered to prove" (citing Wilson, supra, 135 N.J. at 13)).

Moreover, it would have been an unwarranted invasion into Sara's privacy to confront her at trial with evidence of sexual conduct with someone other than defendant. Indeed, a ruling permitting examination of the existence of semen on Sara's shorts would inevitably have led to an impermissible inquiry into Sara's sexual encounters with an unknown third party. Allowing such free examination into Sara's past, especially where the probative value of the evidence and its relevancy to the defense is so insignificant, is precisely what the Rape Shield Law sought to prevent as it would have effectively put Sara on trial and diverted the jury's attention from the conduct at issue in this case. See Statement to Assembly Bill No. 677, supra, at 1 ("It is in the public interest to protect the privacy of the victim, as opposed to allowing the defendant to freely examine the victim's past when the examination serves no material or relevant evidentiary or constitutional purpose."); see also J.A.C., supra, 210 N.J. at 297 ("It is clear from this series of amendments progressively strengthening N.J.S.A. 2C:14-

29

7, that the Legislature's policy is to direct the focus of sexual assault trials toward the alleged crime, and away from the lifestyle of the victim."); see also Garron, supra, 177 N.J. at 165 ("The [Rape] Shield [Law] is intended to deter the unwarranted and unscrupulous foraging for character-assassination information about the victim. The Statute does not permit introduction of evidence of the victim's past sexual conduct to cast the victim as promiscuous or of low moral character.").

Accordingly, we find the trial court's determination that the minimal probative value of the evidence was significantly outweighed by its potential for prejudice is in line with the Legislature's intent in enacting the Rape Shield Law, and proper under the second prong of the Budis/Garron analysis.

IV.

The judgment of the Appellate Division is reversed and defendant's convictions are reinstated.

CHIEF JUSTICE RABNER; JUSTICES LaVECCHIA, ALBIN and PATTERSON; and JUDGE CUFF (temporarily assigned) join in JUSTICE SOLOMON'S opinion. JUSTICE FERNANDEZ-VINA did not participate.

30

SUPREME COURT OF NEW JERSEY

NO.   A-34           SEPTEMBER TERM 2014

ON APPEAL FROM     Appellate Division, Superior Court

STATE OF NEW JERSEY,

Plaintiff-Appellant,

v.

BOBBY PERRY (a/k/a BOBBY PENNY),

Defendant-Respondent.

DECIDED          May 17, 2016
                 Chief Justice Rabner          PRESIDING

OPINION BY     Justice Solomon

CONCURRING/DISSENTING OPINION BY

DISSENTING OPINION BY

| CHECKLIST | REVERSED | |
|---|---|---|
| CHIEF JUSTICE RABNER | X | |
| JUSTICE LaVECCHIA | X | |
| JUSTICE ALBIN | X | |
| JUSTICE PATTERSON | X | |
| JUSTICE FERNANDEZ-VINA | -------------------- | |
| JUSTICE SOLOMON | X | |
| JUDGE CUFF (t/a) | X | |
| TOTALS | 6 | |