# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4972-16T2

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

AURELIO LIBRADO,
a/k/a PAYASO,

     Defendant-Appellant.

_____

Submitted January 15, 2020 – Decided February 3, 2020

Before Judges Koblitz, Whipple and Mawla.

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Indictment No.15-03-0228.

Joseph E. Krakora, Public Defender, attorney for appellant (Marcia H. Blum, Assistant Deputy Public Defender, of counsel and on the briefs).

Camelia M. Valdes, Passaic County Prosecutor, attorney for respondent (Robert John Wisse, Assistant Prosecutor, on counsel and on the brief).

PER CURIAM

Defendant Aurelio Librado appeals from his April 24, 2017 convictions of aggravated sexual contact, endangerment, luring, and criminal restraint of the minor L.A.[1]  The trial court erred in admitting both expert testimony of Child Sexual Assault Accommodation Syndrome (CSAAS) and the victim's belated responses to her parents' questions and subsequent disclosure to her godmother as fresh complaint evidence.  We agree and reverse.

A jury convicted defendant of third-degree aggravated criminal sexual contact, N.J.S.A. 2C:14-3(a) (count three); fourth-degree criminal sexual contact, N.J.S.A. 2C:14-3(b) (count four); third-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(1) (count five); second-degree lure or entice a child, N.J.S.A. 2C:13-6 (count six); and third-degree criminal restraint, N.J.S.A. 2C:13-2(a) (count seven).  Defendant was sentenced to an aggregate eight-year prison sentence.

Trial testimony revealed the following facts. On Saturday, May 25, 2013, between twenty-five and forty guests were invited to defendant's home to celebrate his nephew's first communion.  Defendant lived with his girlfriend, their three children, his girlfriend's two children, and his brother's family.

---

[1]  We use initials pursuant to N.J.S.A. 2A:82-46 and Rule 1:38-3(c)(9).

L.A.'s mother, the communicant's godmother, attended the party with her husband and daughters. Guests were scattered throughout the home and backyard. L.A., then fifteen years old, spent most of her time playing with defendant's young daughters on the front porch.

L.A. exited from the first-floor bathroom and noticed defendant "right outside." Although L.A. had seen defendant "around" prior to this party, she had "never had a conversation with him or anything like that." While defendant's girlfriend testified that defendant did not drink during the party, L.A. recalled that defendant's breath smelled like alcohol. He told her in Spanish that "he wanted [her] to go with him, to speak to him." L.A. responded in Spanish and said that she did not want to, but defendant "pushed" her right arm, directing her out of the first-floor apartment and into a hall. Defendant locked the door from where they exited and the door between the front porch and the hall where they were standing. He then led her down the stairs into the basement, locking the door behind them.

L.A. explained that once in the basement, she did not say anything because she knew nobody would hear her. Defendant pushed L.A. into the wall and kissed her. He pulled down her shirt and bra and sucked on her breast before trying to vaginally penetrate her. Unable to do so, he turned L.A. around and

inserted his penis between her buttocks. After a few minutes, L.A. turned around and defendant again tried to vaginally penetrate her. At that time, L.A. told defendant to leave her alone, but he kept insisting they continue. She said to him that someone will be looking for her, but he said that no one noticed that she was gone. L.A. pushed defendant and quickly pulled up her pants before heading towards the stairs. Defendant grabbed L.A.'s hand and told her not to tell anyone what happened. He kissed her again and then unlocked the door.

L.A. went straight into the bathroom and noticed semen on the tissue she was using to clean herself. About ten minutes later, L.A. returned to the front porch. Defendant's girlfriend's son, J.M. who is around the same age as L.A., saw L.A. crying and asked her what happened. Although L.A. had seen J.M. in the neighborhood, she explained the party was the first time she talked to him. She told him, "[Y]our stepfather sexually violated me." J.M. testified that knowing his stepfather, he did not believe L.A. He did not share with anyone what L.A. told him until he was asked to speak with the Passaic County Police Department a year later, in April 2014.

For the remainder of the party, L.A. tried to avoid her mother because she "felt embarrassed" and "couldn't look at her in the eyes." When asked at trial why L.A. did not immediately tell her mother what happened, L.A. explained

4

she worried about what would happen to her family's relationship with defendant's family and did not want defendant's daughters to grow up without a father. The night of the incident, L.A. tried to act as though nothing happened so her parents would not find out. Her mother testified that while L.A. "seemed . . . calm and at ease" the day of the party, the next day when L.A.'s family was to return to defendant's home for another event, she had to "force" L.A. to come with them.

Although L.A. tried to forget what happened, in the months following the party, she became aggressive, easily irritated and angry. She would complain of stomachaches and did not eat well. She also began to cut herself.

In January 2014, after L.A.'s parents confronted her about her behavior, threatening to send her to see a psychiatrist, she revealed she was "sexually violated." At that time, L.A. did not disclose any details. The next day when L.A.'s parents insisted she tell them more, L.A. cut herself and her parents called the police. L.A. was taken to the police station, but she did not say who had sexually assaulted her. The officer noticed L.A. showed signs of self-harm so she was taken to the hospital, where she stayed for about one week.

The following month, L.A. visited her godmother and told her details about how she was sexually violated. L.A. did not tell her the defendant's name

5

but told her where the incident occurred and the assailant's relationship to her family. The godmother called L.A.'s parents and an ambulance took L.A. to the hospital, where she stayed one night. In March 2014, L.A. spoke with the Passaic County Prosecutor's Office bilingual child interview specialist and named defendant as the person who had sexually violated her.

As allowed by the court, the State presented expert testimony from Dr. Brett A. Biller, Psy.D., on CSAAS, and introduced L.A.'s statements to her mother and godmother as fresh complaints. L.A.'s statement to J.M. was also admitted as an excited utterance. In addition to L.A., who testified extensively about the incident, her mother, godmother, and J.M. were among the seven witnesses the State presented. Defendant did not testify.

On appeal, defendant raises the following issues:

> I. IT WAS ERROR TO ADMIT EXPERT TESTIMONY ON THE CHILD SEX ABUSE ACCOMMODATION SYNDROME BECAUSE IT IS JUNK SCIENCE, WAS NOT RELEVANT TO ANY ISSUE, AND IMPROPERLY BOLSTERED THE STATE'S CASE.
>
> A. CSAAS WAS INADMISSIBLE BECAUSE IT IS JUNK SCIENCE.
>
> B. CSAAS WAS INADMISSIBLE BECAUSE IT WAS NOT RELEVANT TO ANY ISSUE.

6

C. EVEN IF CSAAS TESTIMONY WAS ADMISSIBLE TO EXPLAIN THE PURPORTED DELAYED DISCLOSURE, IT WAS NOT LIMITED TO EXPLAINING DELAYED DISCLOSURE.

II. IT WAS ERROR TO ADMIT THE FRESH-COMPLAINT EVIDENCE BECAUSE THE VICTIM PROMPTLY REPORTED THE ALLEGED ABUSE.

III. THE CUMULATIVE EFFECT OF THE ERRONEOUSLY ADMITTED FRESH-COMPLAINT TESTIMONY AND THE ERRONEOUSLY ADMITTED CSAAS TESTIMONY WARRANTS REVERSAL.

IV. THE MATTER MUST BE REMANDED FOR A NEW SENTENCING HEARING BECAUSE THE CURRENT SENTENCE IS BASED ON THREE INAPPROPRIATE AGGRAVATING FACTORS.

V. THE MATTER MUST BE REMANDED FOR A NEW SENTENCING HEARING BECAUSE THE SENTENCES ON COUNTS 3, 5, AND 7 ARE ILLEGALLY LONG.

We review a trial court's evidentiary rulings under a deferential standard and will "uphold [the trial court's] determinations 'absent a showing of an abuse of discretion.'" State v. Scott, 229 N.J. 469, 479 (2017) (quoting State v. Perry, 225 N.J. 222, 233 (2016)). Under that standard, "[a] reviewing court must not 'substitute its own judgment for that of the trial court' unless there was a 'clear error in judgment'—a ruling 'so wide of the mark that a manifest denial of justice resulted.'" Ibid. (quoting Perry, 225 N.J. at 233). If the trial court applies the

7

incorrect standard, this court reviews the trial court's evidentiary ruling de novo. State v. Garrison, 228 N.J. 182, 194 (2017).

## I. CSAAS evidence inadmissible.

Our Supreme Court recently held that "CSAAS does not satisfy a basic standard of admissibility—reliability—because it is not generally accepted by the scientific community . . . . [T]hefore [it] may no longer be presented to juries," except as to delayed disclosure. State v. J.L.G., 234 N.J. 265, 308 (2018). Thus, Dr. Biller should not have been allowed to testify about CSAAS, unless the delayed disclosure exception applied. We afforded pipeline retroactivity to this holding. State v. G.E.P., 458 N.J. Super. 436, 443 (App. Div. 2019), cert. granted, 239 N.J. 598 (2019).

"Whether a victim's delayed disclosure is beyond the ken of the average juror will depend on . . . [whether] a child witness can[] offer a rational explanation for the delay . . . ." J.L.G., 234 N.J. at 305. In J.L.G, the Court held that expert testimony was not necessary because the victim testified she delayed reporting the abuse because defendant had threatened her, she was embarrassed, and she feared her mother's reaction. Ibid. Similarly, L.A. testified she delayed disclosure

> [b]ecause . . . all that came to my mind was the [defendant's] little girls. I didn't want them not to – not

> – to live without a father. And . . . I knew if I talked
> . . . my family and their family, there is always [going]
> to be issues around since we live in the same town.

Like the victim in J.L.G., L.A. gave sound reasons for why she delayed disclosure to her parents. Since the expert testimony was not required to "assist the trier of fact," the trial court erred in admitting the expert testimony. See N.J.R.E. 702.

## II. Fresh complaint evidence.

L.A. revealed to J.M. that defendant sexually violated her almost immediately after the incident occurred. The court admitted this revelation as an excited utterance. See N.J.R.E. 803(c)(2) (2019). The trial court abused its discretion when admitting L.A.'s statements to her mother and godmother many months later under the fresh complaint doctrine.

The fresh complaint doctrine allows "evidence of a victim's complaint of sexual abuse, otherwise inadmissible as hearsay, to negate the inference that the victim's initial silence or delay indicates that the charge is fabricated." State v. R.K., 220 N.J. 444, 455 (2015). Here, the victim was not initially silent. Instead, she revealed what happened to another child her own age.

Also, "to qualify as fresh-complaint evidence, the victim's statement must have been made spontaneously and voluntarily, within a reasonable time after

the alleged assault, to a person the victim would ordinarily turn to for support." R.K. 220 N.J. at 455. "[S]tatements that are procured by pointed, inquisitive, coercive interrogation," fail to satisfy the spontaneity and voluntary requirement. State v. Hill, 121 N.J. 150, 167 (1990). "The line, however, between non-coercive questioning and coercive questioning depends on the circumstances of the interrogation." Ibid. The trial judge should consider the following factors when making this determination:

> [T]he age of the victim; the circumstances under which the interrogation takes place; the victim's relationship with the interrogator, i.e., relative, friend, professional counselor, or authoritarian figure; who initiated the discussion; the type of questions asked—whether they are leading and their specificity regarding the alleged abuser and the acts alleged.
>
> [Id. at 168.]

In young children, more extensive questioning is allowed. Hill, 121 N.J. at 167. L.A. was fifteen years old, not a young child. The responses to her parents' questioning came at least eight months after the incident and in response to repeated questioning. They pressured her to in a loud voice to explain her aggressive behavior. She told her godmother about the incident a month later. The court abused its discretion in admitting this hearsay evidence from her mother and godmother to support her testimony.

A-4972-16T2

### III. Cumulative error.

Both CSAAS and fresh-complaint testimony from the victim's mother and godmother were improperly admitted. "An error is harmless unless, in light of the record as a whole, there is a 'possibility that it led to an unjust verdict' . . . a possibility 'sufficient to raise a reasonable doubt' that 'the error led the jury to a result it otherwise might not have reached.'" J.L.G., 234 N.J. at 306 (quoting State v. Macon, 57 N.J. 325, 335-36 (1971)). Error that may be harmless in itself, when combined with another error may have a "cumulative effect [that] can cast sufficient doubt on a verdict to require reversal." State v. Jenewicz, 193 N.J. 440, 473 (2008).

After relaying to the jury his extensive educational and experiential credentials, Dr. Biller testified that CSAAS was designed by "advocates for children." He said he worked with children who were victims of child abuse and maltreatment, as did the author of the groundbreaking research that led to CSAAS. He then explained how CSAAS helps to explain how children's behavior might lead someone to believe they were not victims, when in fact they were. Dr. Biller explained in great detail and depth the various behaviors that might mislead an adult into thinking no abuse occurred. Although the court issued a then-applicable brief limiting instruction informing the jury to consider

the testimony only as it relates to delayed disclosure, <u>Model Jury Charges</u> <u>(Criminal)</u>, "Child Sexual Abuse Accommodation Syndrome" (rev. May 16, 2011),[2] we cannot discount the power of the expert's testimony. The evidence was particularly unnecessary because the victim did disclose the abuse immediately, albeit to a peer, and rationally explained the delay in reporting to adult family members.

The improper admission of hearsay evidence, erroneously categorized as "fresh complaint" evidence from the victim's mother and godmother is difficult to weigh. Certainly, where, as here, the case relies on the credibility of the victim, supporting evidence from adult family members is hard to discount. Without opining on whether either of these two significant errors would be harmless in itself, together their weight raises a reasonable doubt as to whether the improper admission of the evidence led to a verdict the jury would otherwise not have rendered.[3]

---

[2] In April 2019, a new jury charge titled "Delayed Disclosure of Child Sexual Abuse (Where State Introduces Expert Testimony)" was approved.

[3] We need not review the sentencing issues, except to comment that the State concedes the court mistakenly imposed illegal concurrent eight-year sentences for the third-degree crimes in counts three, five, and seven.

Reversed and remanded for further proceedings. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4972-16T2