# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3231-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

S.A.B.,[1]

     Defendant-Appellant.

_____

        Submitted May 25, 2021 – Decided June 15, 2021

        Before Judges Yannotti and Mawla.

        On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 17-02-0140.

        Joseph E. Krakora, Public Defender, attorney for appellant (Stefan Van Jura, Assistant Deputy Public Defender, of counsel and on the brief).

---

[1] We use initials to identify defendant and others to protect the identity of a person found to be a child victim of sexual assault or abuse. R. 1:38-3(c)(9), (12).

Gurbir S. Grewal, Attorney General, attorney for respondent (Catlin A. Davis, Deputy Attorney General, of counsel and on the brief).

PER CURIAM

Defendant was tried before a jury and found guilty of fourth-degree criminal sexual contact, N.J.S.A. 2C:14-3(b), and third-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(1). He was sentenced to five years in jail with two and one-half years of parole ineligibility. He appeals from the judgment of conviction (JOC) dated March 19, 2019. We affirm.

I.

In February 2017, defendant was charged under Middlesex County Indictment No. 17-02-0140 with second-degree sexual assault, N.J.S.A. 2C:14-2(c)(3)(b) (count one); two counts of fourth-degree criminal sexual contact, N.J.S.A. 2C:14-3(b) (counts two and five); two counts of second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(1) (counts three and six); and third-degree aggravated criminal sexual contact, N.J.S.A. 2C:14-3(a) (count four). The charges in counts one, two, and three pertained to H.S., and the charges in counts four, five, and six pertained to B.H.

The trial court severed the charges as to the two alleged victims, granted defendant's motion to dismiss count three, and downgraded count six from a

second-degree to a third-degree offense.[2]  The judge also denied defendant's motion to dismiss the remaining counts of the indictment.  In addition, the judge denied defendant's motion to permit him to cross-examine B.H. as to her past sexual activity.  Defendant then was tried on counts four, five, and six.

We briefly summarize the evidence presented at trial.  When she was in fifth grade, B.H. began to attend Eternal Life Christian Center Church (ELCC) with her mother, M.B.  Several years later, B.H. joined the church's youth group, which conducted activities for the church's teenage members.  At the time, defendant was a volunteer leader in the youth group.  He would occasionally give sermons at the bible study meetings, chaperone outings, and attend and chaperone annual retreats.

In October 2013, B.H. stopped attending the youth group activities.  Thereafter, defendant began calling and texting B.H. to convince her to rejoin the group.  B.H. testified that by November 2013, she and defendant were speaking on the phone several times per week and regularly exchanging text

---

[2]  N.J.S.A. 2C:24-4(a) provides that a person who has a legal duty for the care of a child or assumes such responsibility, and "who engages in sexual conduct which would impair or debauch the morals of a child, is guilty of a crime of the second degree."  The statute further provides: "Any other person who engages in conduct or who causes harm as described in this paragraph is guilty of a crime of the third degree."  Ibid.

messages. B.H. said she began to view defendant as a mentor whom she could speak with about her personal issues, the youth group, and her own relationship with God. B.H. testified that by December 2013, she and defendant began discussing sex, and sex was a "pretty normal" part of their conversations.

By January 2014, B.H. had again started to attend the youth group activities and her communications with defendant increased. She would see defendant often at these activities and sometimes he would drive her home. In February 2014, defendant asked B.H. if she would be interested in babysitting his children. Defendant had a daughter who was around eight years old and a son who was around six months old.

B.H. agreed and began to babysit for defendant's children. She did so approximately six to eight times between March and June 2014. Each time, defendant would pick her up at her home and drive her to his house. She would babysit the children from 5:00 p.m. until 9:00 p.m., after which defendant would drive her home.

B.H. stated that during her second visit to defendant's home, he entered the family room where B.H. was babysitting and motioned for her to follow him into an adjacent guest bedroom. Once they were inside the guest bedroom, defendant told B.H. that he had received visions from God indicating she "was

4

hurting." Defendant said he could help her "be happy" and "become closer to God" if they reenacted his "visions."

B.H. said defendant would position her on the floor. He told her where to put her legs and hands based on what he had seen in his "visions." She stated that once he had positioned her, defendant would lay on top of her and "perform movements that [were] basically him having sex with me with our clothes on."

B.H. testified that defendant's actions "definitely made [her] feel uncomfortable." She stated, however, that she viewed defendant as a leader in her church and believed he cared for her, so she trusted him when he said that engaging in this conduct would bring her closer to God.

B.H. said that defendant repeated this conduct each time she babysat for his children, which was five more times. She stated that the simulated sex lasted no longer than five minutes. She noted that defendant would stop when he heard one of the children crying. He also stopped once when he received a telephone call.

B.H. recounted one incident that occurred on May 10, 2014. She recalled that date because it was defendant's daughter's birthday. Defendant's wife, his daughter, and a few of their friends went to New York to celebrate, leaving defendant at home with B.H., who was there to babysit defendant's son. B.H.

5

remembered this incident in detail because this was the only time that defendant brought her into the guest room twice.

B.H. testified that about thirty minutes after the others left for New York, she and defendant went into the guest bedroom. In the room, defendant told B.H. about his most recent vision from God. He positioned her on the rug and then engaged in the same type of simulated sex or "dry humping" as the previous incidents. B.H. stated, however, that this time, defendant took "a lot longer" and was "a lot rougher than normal."

She testified that defendant "had a very serious face," and that the intensity of his movements hurt between her legs. She could feel defendant's erect penis and believed this was why it hurt so badly and was more intense than the previous incidents. B.H. explained that while defendant was on top of her, she felt a burning sensation on her back. When defendant got off, B.H. saw him "pinching the tip of his penis" over his clothing. He went upstairs and changed his clothes.

B.H. stated that when defendant left the room, she felt the small of her back and discovered that she had a rug burn that was wet and painful. She did not immediately tell defendant about her rug burn. Instead, she later took

photographs of the injury when a scab formed and when the burn healed. The burn left a scar.

Later that evening, defendant gestured to B.H. indicating that she should again come into the guest bedroom with him. She explained that this incident stood out in her mind because it was the only time defendant asked her if she "wanted to lay on the floor or the bed." Because of the rug burn, she chose to lay on the bed.

According to B.H., defendant told her to sit on his lap with her legs wrapped around his waist and place her hands around his neck. She said he had his hands on her lower back. While they were on the bed, defendant received a phone call from his wife, and he left to pick up his wife and daughter from the bus station. After they returned, defendant drove B.H. home.

B.H. also testified about another incident when she was at her home alone. Defendant called and told her that he was coming to her house. She told defendant her mother was on her way home from work, and defendant told her to tell her mother that he had to drop something off at their house.

When defendant arrived, B.H. told him her mother had asked that he wait outside until she got home. However, defendant told her to tell her mother he needed to use the bathroom and came into the house anyway. He asked B.H.

where her bedroom was and she said it was upstairs, and they went to her bedroom.

B.H. stated that when they got to the room, defendant's actions were the same as those that had taken place at his home. He told B.H. he felt she or her mother were being hurt physically. Defendant then instructed her to lay down on her bed and he proceeded to engage in simulated sex. She noted that he was at her house only about five minutes, because he knew that her mother was on her way home.

In June 2014, B.H. stopped babysitting for defendant. About a month later, she called A.S., who is one of her mother's friends from church. She told A.S. what defendant had been doing and asked her if it was wrong.

A.S. testified that after their conversation, she immediately went to the church's pastor to inform him what B.H. had told her. In July 2014, the church pastor, his wife, and A.S. met with M.B. to tell her what B.H. had disclosed. M.B. immediately took B.H. to the South Brunswick Police Department (SBPD) to report defendant's conduct. They arrived there between 1:00 a.m. and 2:00 a.m.

The officers took an initial report and asked B.H. and her mother to go home, rest, and return in the morning to give a full statement to the detectives.

B.H. and her mother returned to the police station later that afternoon, and B.H. gave a full statement to several detectives who would be involved in the investigation.

As part of the investigation, B.H. agreed to call defendant on August 5, 2014, while the police listened in and made a recording of the call. In the recorded conversation, defendant told B.H. that she should not be calling him because her mother "is real strict on that." She discussed the rug burn on her back and asked defendant what she should tell her mother about it. He responded, "I have no idea . . . I'm sorry." During the call, defendant did not acknowledge responsibility for the rug burn or implicate himself in any illegal conduct.

Around the same time, M.B. gave the police B.H.'s cell phone and consented to a forensic investigation of the phone which identified sixty-one text messages that were sent between defendant and B.H. from June 7, 2014 to July 4, 2014, fifty-seven text messages sent between A.S. and B.H. from July 24 to July 29, the two photographs of the rug burn on B.H.'s back, and nine video calls from defendant to B.H. between January 14 and June 30, 2014. Thereafter, defendant was arrested.

The State also presented testimony from the officers who were present when B.H. was interviewed and others involved in the investigation. Defendant did not testify but presented testimony from Dr. Barbara Wolf, who was qualified as an expert in the field of forensic pathology.

Dr. Wolf testified about the photos that B.H. took of her back. She stated that the injury shown in the photos were not consistent with a rug burn because such a burn would not be nearly perfectly round, as depicted in the photos. Dr. Wolf also opined that the injury shown in the photos was in the small of the back, and it was unlikely a rug burn would occur at that location.

The jury could not reach a verdict on count four (fourth-degree aggravated criminal sexual conduct). However, the jury found defendant guilty on count five (criminal sexual contact) and count six (third-degree endangering the welfare of a child by engaging in sexual conduct). The judge merged count five with count six and sentenced defendant on count six to five years of incarceration, with a two-and-one-half-year period of parole ineligibility. The judge entered the JOC dated March 19, 2019.

Defendant raises the following arguments on appeal:

> POINT I
> DEFENDANT WAS DENIED DUE PROCESS AND A FAIR TRIAL BY THE INADVERTENT ADMISSION OF A RECORDED PHONE CALL IN

WHICH DEFENDANT EXPRESSED CONCERN THAT THE CALL WAS BEING RECORDED BECAUSE HE WAS BEING INVESTIGATED FOR CRIMES COMMITTED AGAINST A DIFFERENT VICTIM.

POINT II
DEFENDANT WAS DENIED HIS CONSTITUTIONAL RIGHTS TO PRESENT A COMPLETE DEFENSE BY THE TRIAL COURT'S MISAPPLICATION OF THE RAPE SHIELD STATUTE, N.J.S.A. 2C:14-7, TO EXCLUDE EVIDENCE THAT WOULD HAVE IMPEACHED B.H.'S TESTIMONY AND ESTABLISHED HER MOTIVE TO LIE.

POINT III
TWO INSTANCES OF BOLSTERING B.H.'S CREDIBILITY DENIED DEFENDANT A FAIR TRIAL WHERE THE CREDIBILITY OF B.H. WAS THE LYNCHPIN IN THE STATE'S CASE.

POINT IV
THE MATTER MUST BE REMANDED FOR RESENTENCING BECAUSE THE SENTENCING COURT DOUBLE-COUNTED AGGRAVATING FACTOR (4) WHEN IMPOSING SENTENCE.

II.

Defendant first argues that he was denied due process and a fair trial when the prosecutor inadvertently played portions of a recorded telephone conversation between defendant and B.H., which the parties had agreed to

11

redact.   When the prosecutor realized the error, he immediately stopped the recording.   However, the jury heard the following:

B.H.:  Hello.

Defendant:  Hey, you can't call me (indiscernible) your mom is real strict on that.

B.H.:  I'm just calling to see how you're doing.

Defendant:  Okay, well, I'm all good here.   But (indiscernible) called me, you know I was at phone and I picked up the phone and then we got off the phone, because it's crazy right now.  Okay?

B.H.:  Is everything --

Defendant:  Everything's as good as it can be, okay? Really.

B.H.:  Okay.

Defendant:  Really.  It's as good as it can be.  All right?

B.H.:  Like are you all right?

Defendant:  I'm okay.  It's just you just got to find a better way to get a hold of me but you can't do this because your mom will (indiscernible).  All right?

B.H.:  Yeah.

Defendant:  Just let her -- what?

B.H.:  She's not home, like I'm home by myself.

> Defendant: I know, we can't still talk. People are [checking] phones, they're doing everything. All right.[3]

After a brief sidebar, the judge informed the jury that there was a problem with the recording. The judge excused the jury and discussed the matter with counsel. Defendant moved for a mistrial, arguing that while the prosecutor did not intend to play the unredacted recording, the jury heard a statement which suggested defendant had committed crimes or bad acts with another victim. He argued he was prejudiced by the admission of this evidence.

The judge denied the motion. The judge found that at most the recording suggested "defendant is concerned that law enforcement may become aware that he is conversing with [B.H.], which arguably betrays a consciousness of guilt unrelated to the charges connected to the other victim."

The judge stated that nothing in the recording suggested to the jury that there was another victim. The judge also noted that because defendant's statement betrayed a consciousness of guilt regarding his conversation with B.H., the evidence "might not necessarily be inadmissible." However, because the parties had agreed to redact parts of the recording, the judge found it was

---

[3] The transcript of the call indicates that defendant stated people were "kicking" phones. The parties agree this was incorrect, and defendant stated that people were "checking" phones.

appropriate to honor that agreement. Thus, the jury would hear the redacted version of the recording.

The judge asked counsel if they had a recommended curative instruction for the jury. Defendant's attorney did not propose an instruction and renewed his motion for a mistrial. The parties and the judge then agreed that any instruction that mentioned the statements on the unredacted recording would bring more attention to the statement.

The judge instructed the jurors as follows:

> When we were here [previously], we were playing. . . the audio recording . . . there was a problem with the recording. That recording will be replayed again this morning.
>
> You . . . shall only consider what you hear today as it is replayed, and that if anything you hear today conflicts with what you previously heard on Thursday during the playback, you'll rely only on what you hear today and ignore what you think you may have heard on Thursday.

"A mistrial should only be granted 'to prevent an obvious failure of justice.'" State v. Smith, 224 N.J. 36, 47 (2016) (quoting State v. Harvey, 151 N.J. 117, 205 (1997)). "Whether an event at trial justifies a mistrial is a decision 'entrusted to the sound discretion of the trial court.'" Ibid. (quoting Harvey, 151 N.J. at 205). On appeal, a reviewing court "will not disturb a trial court's ruling

14

on a motion for a mistrial, absent an abuse of discretion that results in a manifest injustice." Ibid. (quoting State v. Jackson, 211 N.J. 394, 407 (2012)).

When appropriate alternative courses of action are available, "a mistrial is not a proper exercise of discretion." Ibid. (quoting State v. Allah, 170 N.J. 269, 281 (2002)). "For example, a curative instruction, a short adjournment or continuance, or some other remedy, may provide a viable alternative to a mistrial, depending on the facts of the case." Ibid. (citing State v. Clark, 347 N.J. Super. 497, 509 (App. Div. 2002)).

On appeal, defendant argues the judge erred by failing to declare a mistrial. He contends the unredacted recording included inadmissible evidence of other crimes or bad acts under N.J.R.E. 404(b) and State v. Cofield, 127 N.J. 328, 338 (1992). He argues that aside from the recording, the State had presented sufficient evidence showing he had extensive communications with B.H. He therefore asserts the recording was not relevant to any material issue in the case. He contends the unredacted version allowed the jury to speculate that defendant was "hyper-vigilant" in his call to B.H. because there were other victims.

We are convinced defendant's arguments are entirely without merit. As the trial judge found, the unredacted recording did not suggest there was more

than one victim of defendant's alleged criminal sexual conduct. In the call, defendant merely expressed the belief that certain "people" may be listening to his phone calls. Defendant was speaking with B.H. and he did not mention calls with anyone else. The record supports the judge's finding that the unredacted recording did not include evidence of other crimes or bad acts and therefore N.J.R.E. 404(b) and Cofield did not apply.

Moreover, the judge properly decided to deny defendant's motion for a mistrial and address the inadvertent playing of the unredacted recording with a curative instruction. The decision to give a "curative or limiting instruction, instead of a mistrial or new trial, depends on at least three factors." State v. Herbert, 457 N.J. Super. 490, 505 (App. Div. 2019).

"First, a court should consider the nature of the inadmissible evidence the jury heard, and its prejudicial effect." Ibid. "Second, an instruction's timing and substance affect its likelihood of success . . . . [O]ur Court has held that a swift and firm instruction is better than a delayed one." Id. at 507-06 (quoting State v. Winter, 96 N.J. 640, 648 (1984)). Finally, a court must "consider its tolerance for the risk of imperfect compliance." Id. at 507 (quoting Winter, 96 N.J. at 647).

As noted, the judge told the jury there had been a problem with the recording, and the recording, with the agreed-upon redactions, was then played for the jury. The judge instructed the jury that it should only consider and decide the case based on that recording. The judge emphasized that "if anything you hear today conflicts with what you previously heard . . . you'll rely only on what you hear today and ignore what you think you may have heard [previously]." We must assume the jury complied with the court's instruction. State v. Loftin, 146 N.J. 295, 390 (1996) (citing State v. Manley, 54 N.J. 259, 271 (1969)).

We therefore reject defendant's contention that he was denied due process and a fair trial because the jury heard the unredacted tape of his phone call to B.H. The judge did not err by denying defendant's motion for a mistrial, and the judge appropriately addressed the inadvertent playing of the unredacted recording with a curative instruction.

As noted previously, the trial judge indicated that defendant's statements during the call showed a consciousness of guilt, and his comments regarding the possible monitoring of his calls may have been admissible under N.J.R.E. 404(b) and Cofield. However, we need not address defendant's contention that his statements were inadmissible evidence of other crimes or bad acts. As we have

explained, the judge played the jury the redacted version of the recording and told the jurors to disregard the previously played version without the redactions.

III.

Defendant also argues that the trial judge erred by applying the Rape Shield Law (RSL), N.J.S.A. 2C:14-7, and limiting his cross-examination of B.H. He contends he was denied his constitutional right to present a complete defense.

We review a trial court's evidentiary ruling for abuse of discretion, and we will not set aside such a ruling "absent a showing of an abuse of discretion, i.e., there has been a clear error of judgment." State v. Perry, 225 N.J. 222, 233 (2016) (quoting State v. Brown, 170 N.J. 138, 147 (2001)). An appellate court "should not substitute its own judgment for that of the trial court, unless 'the trial court's ruling "was so wide of the mark that a manifest denial of justice resulted."'" Ibid. (quoting State v. Marrero, 148 N.J. 469, 484 (1997)).

The admissibility of evidence concerning "a victim's prior sexual conduct is governed by [the RSL], N.J.S.A. 2C:14-7." Id. at 234. Sexual conduct is defined in the RSL as "any conduct or behavior relating to sexual activities of the victim, including but not limited to previous or subsequent experience of sexual penetration or sexual contact, use of contraceptives, sexual activities

reflected in gynecological records, living arrangement and life style."  N.J.S.A. 2C:14-7(f).

The RSL presumptively bars evidence of a victim's prior sexual conduct in prosecutions for certain sexual offenses including, "aggravated criminal sexual contact, criminal sexual contact, . . . [and] endangering the welfare of a child."  N.J.S.A. 2C:14-7(a).  The law was "designed to 'deter the unwarranted and unscrupulous foraging for character-assassination information about the victim' and 'does not permit introduction of evidence of the victim's past sexual conduct to cast the victim as promiscuous or of low moral character.'"  Perry, 225 N.J. at 234 (quoting State v. Schnabel, 196 N.J. 116, 128 (2008)).

To overcome the presumptive bar, the defendant must show that the evidence is "'relevant and highly material, meets the requirements of subsections (c) and (d) of [the statute],' and its probative value 'substantially outweighs its collateral nature or the probability that its admission will create undue prejudice, confusion of the issues, or unwarranted invasion of the privacy of the victim.'"  Ibid. (quoting N.J.S.A. 2C:14-7(a)).

Sections (c) and (d) of the statute state that evidence of a victim's past sexual conduct is relevant only where "it is material to proving the source of semen, pregnancy or disease," or it is probative to determine "whether a

reasonable person, knowing what the defendant knew at the time of the alleged offense, would have believed that the alleged victim freely and affirmatively" consented. N.J.S.A. 2C:14-7(c) to (d).

Because the RSL strictly limits the admission of evidence regarding a victim's past sexual conduct, our Supreme Court has acknowledged "the tension between [a] defendant's right to confrontation and the compulsory process of witnesses, and the victim's right to be free from an unnecessary invasion of her privacy" under the RSL. Perry, 225 N.J. at 235 (quoting State v. Garron, 177 N.J. 147, 168-69 (2003)). The Court has stated that "[w]hile the protection of the 'privacy interests of the victim' is certainly paramount to its purpose, the [RSL] also aims to 'ensur[e] a fair determination of the issues bearing on the guilt or innocence of the defendant.'" Ibid. (quoting State v. P.S., 202 N.J. 232, 261 (2010)).

To achieve these goals, the Court has "consistently refused to construe the [RSL] in a way that would impinge on a defendant's constitutional right to a fair trial." Ibid. That right includes "'a meaningful opportunity to present a complete defense' as well as a defendant's right to confront the witnesses against him and to have compulsory process for obtaining witnesses in his favor." Ibid. (citing State v. J.A.C., 210 N.J. 281, 298 (2012)).

"[T]o ensure that application of the [RSL] does not unduly trample on a criminal defendant's constitutional rights to confrontation and compulsory process," the Court in State v. Budis, 125 N.J. 519 (1991), "departed from the literal language of N.J.S.A. 2C:14-7(a), which requires evidence of a victim's previous sexual conduct to be 'relevant and highly material,' and to have probative value that 'substantially outweighs' its collateral nature or prejudicial effect." Perry, 225 N.J. at 236 (quoting J.A.C., 210 N.J. at 298). Rather, the Court stated that "such evidence should be admitted if it is 'relevant to the defense . . . [and] its probative value outweighs its . . . prejudicial effect.'" Ibid.

On appeal, defendant argues that admission of evidence of B.H.'s past sexual conduct with her boyfriend was critical to show she had a motive to fabricate allegations against him and thereby draw attention away from her sexual activity. He contends evidence of B.H.'s "contemporaneous sexual activity" with her boyfriend was relevant to show that it was plausible B.H.'s boyfriend caused the burn. We disagree.

At a pretrial hearing, defendant claimed that in a deposition, B.H. had testified that she told a friend in September 2013 she was no longer a virgin because she had sex with her then-boyfriend. However, during that deposition, B.H. had also testified her relationship with her boyfriend had ended in March

2014. B.H. indicated that by the time she began babysitting for defendant's children, she was not speaking with her boyfriend at all.

Furthermore, there was no evidence to support the claim that B.H. engaged in any activity with her boyfriend that would have caused the type of rug burn she suffered. Thus, evidence of B.H.'s prior sexual activity with her boyfriend lacked sufficient evidential support, was not relevant to any material issue in the case and was not necessary to the defense. Perry, 225 N.J. at 237 (quoting J.A.C., 210 N.J. at 298).

Therefore, the trial judge did not mistakenly exercise his discretion by refusing to permit defendant to cross-examine B.H. about her prior sexual activity with her boyfriend. The judge's ruling was entirely consistent with the purposes and goals of the RSL, and it did not deny defendant of his right to present a complete defense.

IV.

Defendant further argues that in their testimony, two of the detectives who had investigated the allegations, improperly bolstered the credibility of B.H.'s allegations, which was the lynchpin of the State's case. He contends that because of the erroneous admission of this improper testimony, he was denied a fair trial.

Defendant's argument is based on the testimony of Detectives Nathan Labuda and Roger Tuohy of the SBPD. At trial, Labuda testified as follows:

> Q: And you indicated that you were the primary interviewer, that you asked the most questions during the interview?
>
> A: Yes.
>
> Q: Did you, or if you can recall, did you make any observations about [B.H.'s] physical or emotional condition during the course of the interview?
>
> A: She was small in stature, she seemed younger than [fifteen] years old to me. She seemed very honest and forthcoming --
>
> DEFENSE COUNEL: Objection to that.
>
> THE COURT: Sustained.

Tuohy also was asked to discuss his observations of B.H. during the interview. He testified as follows:

> Q: Okay. Now I'd like to ask you about some observations that you may have made during the interview. What I'm not asking for is a recitation of what [B.H.] said during the interview, if that's okay. During the time that you were present for the interview, did you make any observations about [B.H.'s] physical or emotional state during the questioning?
>
> A: Yes. She appeared extremely sincere and --
>
> THE COURT: Sustained.

23

Although defense counsel had objected to the detectives' comments on B.H.'s honesty and sincerity, and the court had sustained the objections, counsel did not move to strike the comments from the record or seek a curative instruction.

"[C]redibility is an issue which is peculiarly within the jury's ken and with respect to which ordinarily jurors require no expert assistance." State v. Dellisanti, 203 N.J. 444, 462 (2010) (quoting State v. Frisby, 174 N.J. 583, 595 (2002)). It is impermissible for the State to "attack one witness's credibility through another witness's assessment of that credibility." State v. R.K., 220 N.J. 444, 458 (2015) (citing Frisby, 174 N.J. at 593-94).

As noted, the assistant prosecutor asked Labuda and Tuohy to describe their observations of B.H.'s physical and emotional condition during her interview. Such questions were appropriate. The assistant prosecutor did not ask either detective to comment on B.H.'s honesty or sincerity. Thus, the assistant prosecutor did not seek to elicit testimony to bolster B.H.'s credibility.

Moreover, defense counsel objected to the comments and the judge sustained those objections. The judge did not strike the improper testimony but instructed the jury on the meaning of sustained objections. The judge stated:

> During the trial, the attorneys may make objections [to] evidence [which] is offered or they may address

> motions to me. They have a right and indeed a duty to make objections and motions when it seems to them to be proper to do so. I have a duty to act upon objections and motions based upon the law.
>
> If you hear me say that an objection is overruled, that means I am ruling against the attorney making the objection. If I say the objection is sustained, I am ruling in favor of the attorney making the objection. Anything excluded by me is not evidence and must not be considered by you in your deliberations.

Although the judge did not instruct the jury to disregard the officers' testimony regarding B.H.'s honesty and credibility, defense counsel did not request such an instruction. Nevertheless, the judge instructed the jury that it had the sole responsibility to determine the credibility of the witnesses. In addition, during jury selection, the jurors had confirmed they would not credit the testimony of a witness merely because of his or her status as a law enforcement officer.

We are convinced that, under the circumstances, the judge's failure to strike the officers' comments regarding B.H.'s honesty and sincerity and instruct the jury to disregard those statements was harmless error. Like the trial judge in Dellisanti, the judge in this case "provided a full and appropriate instruction to the jury on how to address credibility," and weigh the testimony of the witnesses. Dellisanti, 203 N.J. at 463.

A-3231-18

We therefore reject defendant's contention that the officers' comments regarding B.H.'s honesty and credibility require reversal of his convictions. The erroneous admission of those comments was not "clearly capable of producing an unjust result." R. 2:10-2.

V.

Defendant also contends he should be resentenced. He contends the judge failed to comply with the sentencing guidelines. We disagree.

When reviewing a trial court's sentencing determination, we apply a deferential standard of review. State v. Fuentes, 217 N.J. 57, 70 (2014). "The reviewing court must not substitute its judgment for that of the sentencing court." Ibid. (citing State v. O'Donnell, 117 N.J. 210, 215 (1989)). On appeal, our review is limited to consideration of:

> (1) whether guidelines for sentencing established by the Legislature or by the courts were violated; (2) whether the aggravating and mitigating factors found by the sentencing court were based on competent credible evidence in the record; and (3) whether the sentence was nevertheless "clearly unreasonable so as to shock the judicial conscience."
>
> [State v. Liepe, 239 N.J. 359, 371 (2019) (quoting State v. McGuire, 419 N.J. Super. 88, 158 (App. Div. 2011)).]

Here, the judge found aggravating factors three, N.J.S.A. 2C:44-1(a)(3) (risk that defendant will commit another offense); four, N.J.S.A. 2C:44-1(a)(4) (defendant took advantage of a position of trust or confidence to commit the offense); six, N.J.S.A. 2C:44-1(a)(6) (extent of defendant's prior criminal record and the seriousness of the offenses for which he has been convicted); and nine, N.J.S.A. 2C:44-1(a)(9) (need to deter defendant and others from violating the law). The judge found no mitigating factors.

As noted previously, the judge merged count five (criminal sexual contact) with count six (endangering the welfare of a child), and sentenced defendant on count six to a five-year prison term, with two and one-half years of parole ineligibility. The judge also ordered defendant to comply with the reporting and notification requirements of Megan's Law, N.J.S.A. 2C:7-1 to -23.

On appeal, defendant argues the judge erred by finding aggravating factor four. He notes that he was found guilty of third-degree endangering the welfare of a child by engaging in sexual conduct that would impair or debauch the morals of the child, which does not require proof that he had a legal duty for the care of a child or assumed such responsibility. N.J.S.A. 2C:24-4(a)(1). He argues, however, that the judge improperly engaged in double counting because "it is

difficult to conceive of how an adult could engage in such acts with a child without taking advantage of a position of trust or confidence."

Impermissible double counting occurs when "established elements of a crime for which a defendant is being sentenced . . . [are] considered as aggravating circumstances in determining that sentence." State v. Kromphold, 162 N.J. 345, 353 (2000) (citing State v. Yarbough, 100 N.J. 627, 33 (1985)). As we have explained, however, to find a defendant guilty of third-degree endangering the welfare of a child under N.J.S.A. 2C:24-4(a)(1), the State is not required to prove the defendant held a position of trust or confidence over the affected child.

The State only is required to establish that the victim was a child, and the defendant knowingly engaged in sexual conduct that would impair or debauch that child's morals. See Model Jury Charges (Criminal), "Endangering the Welfare of a Child, Sexual Conduct (Third Degree) (N.J.S.A. 2C:24-4(a)(1))" (rev. Apr. 7, 2014). Because proof that defendant took advantage of a position of trust or confidence is not an element of the offense, the judge's finding of aggravating factor four in this matter does not represent impermissible double counting.

There also is no merit to defendant's contention that taking advantage of a position of trust and confidence is implicit in conduct charged under N.J.S.A. 2C:24-4(a)(1). We have recognized that a defendant can endanger the welfare of a child by engaging in sexual conduct even though the offender did not hold a position of trust or confidence over the child. State v. Hackett, 323 N.J. Super. 460, 469-70 (App. Div. 1999), aff'd as modified on other grounds, 166 N.J. 66 (2001).

In addition, as we have explained, the absence of a legal duty for the care of a child is what distinguishes third-degree from second-degree endangering of a child by engaging in sexual conduct. N.J.S.A. 2C:24-4(a); see State v. Sumulikoski, 221 N.J. 93, 108 (2015) (noting that "the profound harm that can be inflicted on a child by one who holds a position of trust is what propels the offense of endangering from a third- to a second-degree offense.").

We therefore reject defendant's contention that the judge erred by finding aggravating factor four. The record fully supports the judge's finding that defendant took advantage of a position of trust and confidence to commit the offense. The judge complied with the sentencing guidelines, and the sentence represents a reasonable exercise of the court's sentencing authority.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

29

A-3231-18