**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2266-21

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

AVERY E. BRACEY,

     Defendant-Appellant.

_____

Submitted September 24, 2024 – Decided November 12, 2024

Before Judges Gilson, Firko, and Augostini.

On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Indictment Nos. 19-03-0654 and 20-10-0584.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Laura B. Lasota, Assistant Deputy Public Defender, of counsel and on the brief).

Matthew J. Platkin, Attorney General, attorney for respondent (Regina M. Oberholzer, Deputy Attorney General, of counsel and on the brief).

PER CURIAM

A jury convicted defendant Avery Bracey of sixteen crimes related to two armed robberies, during which one of the victims was shot and killed. The convictions included two counts of first-degree armed robbery, N.J.S.A. 2C:15-1(a)(1); first-degree felony murder, N.J.S.A. 2C:11-3(a)(3); first-degree attempted witness tampering, N.J.S.A. 2C:28-5(a)(2) and N.J.S.A. 2C:5-1A(3); and related weapons and narcotics offenses. In a separate trial, defendant was convicted of second-degree certain persons not to have a weapon, N.J.S.A. 2C:39-7(b). On those seventeen convictions, defendant was sentenced to an aggregate prison term of ninety-eight years, with greater than eighty years of parole ineligibility.

Defendant appeals from his convictions and sentences, arguing the trial court erred in: (1) denying his motion to exclude four out-of-court identifications; (2) granting the State's motion to join two indictments; (3) failing to grant a mistrial following testimony by a State witness; (4) instructing the jury regarding unanimity; (5) denying defendant's request for a third-party guilt charge; and (6) imposing excessive sentences. Having reviewed the record and law, we reject all defendant's arguments. We, therefore, affirm all his convictions.

We also affirm his sentences, with two limited exceptions. In sentencing defendant, the trial court incorrectly merged a conviction for second-degree unlawful possession of a weapon without a permit, N.J.S.A. 2C:39-5(b)(1) (count three), with a conviction for second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1) (count four). We, therefore, remand for the limited purpose of correcting the sentences on those two convictions. At the resentencing, the conviction for possession of a weapon for an unlawful purpose is to be merged with the related robbery conviction. The court will then sentence defendant on the conviction for unlawful possession of a weapon without a permit.

## I.

Defendant's convictions arose out of a series of events that occurred on the evening of January 4, 2019, and the early morning hours of January 5, 2019. During that time, defendant compelled a taxi driver to take him to a motel. At the motel, defendant threatened a group of people, including an infant, with a gun, and shot and killed a man. Shortly thereafter, defendant brandished a gun in a fast-food restaurant. Finally, defendant shot another man in the leg for no apparent reason. We summarize the facts from the evidence presented at trial.

A-2266-21

On the evening of January 4, 2019, J.D. (Jerry) was driving a taxi in Atlantic City.[1] Sometime after 8:00 p.m., Jerry picked up a man who was later identified as defendant. Jerry then received a call from a person requesting to be picked up from the Sunset Motel.[2] Defendant apparently overheard the request, because thereafter he pointed a gun at Jerry and ordered him to take him to the motel. Defendant told Jerry that the people in the motel room had robbed him. At the motel, defendant told Jerry to wait for him and got out of the taxi without paying for the ride. When defendant walked away, Jerry left and did not report the incident.

Seven young people had rented Room 18 at the Sunset Motel. One of those persons, K.E. (Kim), had her one-year-old son with her. The people in the motel room all knew each other and at that time were living at the Covenant House, a homeless shelter for young adults. They had rented the motel room to hang out together and some of them had been drinking, smoking marijuana, and using cocaine.

---

[1] We use initials and fictitious names for the victims and witnesses to protect their privacy interests. Rule 1:38-3(c).

[2] The Sunset Motel is also sometimes referred to as the "Sunset Inn Motel" in the record and in the parties' briefings.

At approximately 8:30 p.m., J.M. (Jamie) called a taxi to take the group back to the Covenant House, which had a 9:00 p.m. curfew. Shortly thereafter, someone knocked on the motel-room door and Jamie opened the door assuming the person was the cab driver.

Defendant came into the motel room carrying a gun, accused the group of robbing him, and demanded money. Defendant then shot K.H. (Ken), and four of the people in the room fled to the bathroom and locked the door. Defendant demanded that the group come out of the bathroom and threatened to shoot the baby if they did not. Some of the people in the room offered to give defendant their phones and wallets, but defendant stated that he wanted his money. Shortly afterwards, defendant left the motel room.

The police were called, and several officers responded to the motel. When the police arrived, Ken was still alive but in critical condition. Ken was taken to the hospital, where he was later pronounced dead.

The police questioned the other occupants of the room. The occupants gave general descriptions of defendant and were taken to the police station for further questioning. The police also recovered a shell casing from the room.

As part of their investigation, the police reviewed and copied surveillance video footage from the motel. The footage showed that at approximately 8:38

5

A-2266-21

p.m., a taxi pulled up to the motel, an individual dressed in dark clothing got out of the cab, and the taxi drove away. A short time later, the individual who got out of the cab was seen walking away from the motel.

Sometime after 10:00 p.m. that same night, the police received a call from a Popeye's restaurant. The reporter from Popeye's informed the police that a man had pulled out a gun and shown it to the cashier. The police responded to Popeye's and collected and reviewed video footage from surveillance cameras at the restaurant. A man depicted in the footage appeared to match the description of the suspect provided by some of the motel victims. Therefore, a detective took a still photo of the man shown in the video footage.

At the police station, officers interviewed each of the six surviving adult occupants of the motel room. All the occupants were shown the photograph taken from the video footage at the Popeye's restaurant. Three of the occupants—Kim, J.H. (Jim), and Z.J. (Zack)—identified defendant as the man who had come into their motel room. Those three occupants also testified and identified defendant at trial.

Just after 2:00 a.m. on January 5, 2019, Atlantic City's "ShotSpotter" notification system—a system that can pinpoint the location of a gunshot through triangulation of sound—indicated a probable gunshot near the

6

intersections of Florida and Atlantic Avenues. Two officers responded and they saw a man, later identified as defendant, walking on Florida Avenue. Defendant was wearing clothes that matched the description given by some of the witnesses from the motel room and defendant was arrested. A search of his person revealed that he was carrying a semi-automatic handgun in his jacket pocket that was loaded with .40 caliber cartridges. At trial, ballistic evidence was presented that matched the shell casing found in the motel room to the gun found on defendant.

A further search of defendant's person revealed that he had thirty-six baggies of crack cocaine, $451 in cash, and a cell phone. Text messages recovered from defendant's cell phone indicated that around the time of the motel shooting, defendant had been looking to get payback for something. The call logs associated with defendant's cell phone also revealed that he had called Jerry—the taxi driver—at 8:12 p.m. and 8:43 p.m. on January 4, 2019.

Just after 3:00 a.m. on January 5, 2019, police received a call from a local hospital that a patient had arrived with a gunshot wound to his leg. An officer went to the hospital and interviewed M.L. (Mack). Mack informed the officer that he had been walking down Florida Avenue when he passed someone he knew as "Philly." Philly then shot Mack once in the leg. The officer showed

7

Mack a photograph of defendant and Mack identified him as Philly. During trial, Mack also identified defendant as the shooter.

The day after the motel shooting, police located Jerry the taxi driver. Jerry explained that he had given defendant a ride a few times before January 4, 2019. He also described his interactions with defendant on the evening of January 4, 2019. He was not, however, able to identify defendant.

In March 2019, defendant was indicted for seventeen crimes related to the four incidences that occurred on January 4 and 5, 2019. Those charges included first-degree robbery of Jerry, N.J.S.A. 2C:15-1(a)(1); second-degree kidnapping to facilitate the commission of a crime, N.J.S.A. 2C:13-1(b)(1); second-degree unlawful possession of a handgun without a permit, N.J.S.A. 2C:39-5(b)(1) (count three); second-degree possession of a handgun for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1) (count four); first-degree murder of Ken, N.J.S.A. 2C:11-3(a)(1); first-degree robbery; first-degree felony murder, N.J.S.A. 2C:11-3(a)(3); third-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(2); fourth-degree aggravated assault of the cashier at the Popeye's restaurant, N.J.S.A. 2C:12-1(b)(4); second-degree aggravated assault of Mack, N.J.S.A. 2C:12-1(b)(1); as well as related weapons and narcotic offenses.

8

While defendant was being detained on those charges, in January 2020, law enforcement officers executed a warrant to search the home of Mark Fersner in an unrelated investigation. During that search, a detective found two letters that defendant had sent to Fersner from jail. In those letters, defendant asked Fersner to call various victims and witnesses and either intimidate them from coming to trial or pay them not to testify against him.

Thereafter, in October 2020, defendant was charged with seven counts of first-degree attempted witness tampering, N.J.S.A. 2C:5-1(a)(3) and 2C:28-5(a)(2); and two counts of second-degree attempted bribery of a witness, N.J.S.A. 2C:28-5(d) and 2C:5-1(a)(3). The State later amended that indictment and combined the seven attempted-witness-tampering charges into a single charge and the two attempted-bribery charges into a single charge. The State also moved to join all the charges in the two indictments to be adjudicated in one trial. The court granted that motion.

Before trial, defendant moved to suppress the out-of-court identifications made by Zack, Jim, Kim, and Mack. The court conducted an evidentiary hearing, known as a <u>Wade</u> hearing,[3] and heard testimony from two detectives concerning the out-of-court identifications. Based on the evidence at the <u>Wade</u>

---

[3] <u>United States v. Wade</u>, 388 U.S. 218 (1967).

9

-21A-2266-21

hearing, the trial court denied the motion to suppress finding that all four identifications were reliable.

A jury trial was conducted in August 2021. At trial, the State presented testimony from numerous witnesses, including the people who had been in the motel room, Mack, who had been shot in the leg, various officers who had investigated the incidences, and a ballistics expert.

Defendant elected not to testify but called B.B. as a witness. B.B. testified that he had known defendant for about a decade and that they had been incarcerated in a jail together. He stated that on January 4 of an unknown year, after 10:30 p.m., he was near the Atlantic City bus terminal when a man approached him trying to sell him a gun. Thereafter, B.B. ran into defendant who explained that he had recently been robbed. Believing that defendant was looking to obtain a gun, B.B. introduced defendant to the man who had attempted to sell him a gun. B.B. then saw defendant and the man speak privately and saw the man show defendant a gun.

After hearing all the evidence, the jury convicted defendant of sixteen crimes: (1) first-degree armed robbery of Jerry; (2) third-degree criminal restraint, as a lesser included offense of kidnapping; (3) unlawful possession of a handgun (count three); (4) possession of a handgun for an unlawful purpose

10

(count four); (5) first-degree aggravated manslaughter of Ken, as a lesser included offense of first-degree murder; (6) first-degree armed robbery related to the motel incident; (7) felony murder; (8) possession of a handgun for an unlawful purpose; (9) fourth-degree aggravated assault of the cashier at the Popeye's restaurant; (10) possession of a handgun for an unlawful purpose; (11) terroristic threats; (12) second-degree aggravated assault of Mack; (13) possession of a handgun for an unlawful purpose: (14) third-degree possession of cocaine, as a lesser included offense of possession of cocaine with the intent to distribute; (15) attempted witness tampering; and (16) attempted bribery of a witness.  In a separate bench trial, defendant was convicted of second-degree certain persons not to have a weapon.

At sentencing, the trial court reviewed the convictions related to the four different incidences.  The court also analyzed the Yarbough factors[4] and found that the convictions arose out of four separate and independent criminal events involving multiple victims.  The court then imposed sentences.

On the robbery conviction related to Jerry, the court imposed a seventeen-year prison term with periods of parole ineligibility and supervision as prescribed by the No Early Release Act (NERA), N.J.S.A. 2C:43-7.  The court

_____

[4] State v. Yarbough, 100 N.J. 627 (1985).

merged count three into count four and, on the possession of a handgun for an unlawful purpose, imposed an eight-year prison term to run concurrent to the robbery conviction. On the felony murder conviction, the court imposed a fifty-year prison term subject to NERA and directed that the sentence was to run consecutive to the robbery conviction. On the conviction for possession of a weapon for an unlawful purpose related to the Popeye's incident, the court sentenced defendant to five years in prison, with forty-two months of parole ineligibility, to run consecutive to the felony murder conviction. For the conviction related to the aggravated assault of Mack, the court imposed an eight-year sentence subject to NERA and ruled that the sentence was to run consecutive to the conviction for possession of a weapon for an unlawful purpose under count eleven. On the convictions for possession of cocaine and certain persons not to have a weapon, the court imposed, respectively, three and five-year prison terms and directed that they were to run concurrent to defendant's other sentences. Finally, on the conviction for witness tampering, the court imposed an eighteen-year prison term and directed that the sentence was to run consecutive to defendant's other sentences. Consequently, in aggregate, defendant was sentenced to ninety-eight years in prison, with greater than eighty years of parole ineligibility.

12

Defendant now appeals from his convictions and sentences.

II.

On appeal, defendant presents six arguments for our consideration, which he articulates as follows:

> POINT I – THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION TO EXCLUDE FOUR OUT-OF-COURT IDENTIFICATIONS.
>
> A. The <u>Wade</u> Hearing Testimony And The Trial Court's Decision.
>
> B. The Identifications Should Have Been Suppressed Because They Were Unreliable.
>
> POINT II – THE TRIAL COURT ERRED IN GRANTING THE STATE'S MOTION TO JOIN THE INDICTMENTS.
>
> POINT III – THE TRIAL COURT ERRED WHEN IT FAILED TO GRANT A MISTRIAL AFTER A STATE'S WITNESS HAD AN OUTBURST DURING TRIAL.
>
> POINT IV – THE FINAL INSTRUCTIONS PERMITTED THE JURY TO RETURN NON-UNANIMOUS VERDICTS ON SOME COUNTS, IN VIOLATION OF DEFENDANT'S RIGHT TO A UNANIMOUS VERDICT.
>
> POINT V – THE TRIAL COURT ERRED IN DENYING DEFENDANT'S REQUEST FOR A THIRD-PARTY GUILT CHARGE.

13

<u>POINT VI</u> – ERRORS AT SENTENCING RESULTED IN AN EXCESSIVE SENTENCE THAT MUST BE REVERSED.

    A.    Defendant's Right To Allocute Before Sentencing Was Not Honored.

    B.    Concurrent Sentences Should Have Been Imposed For The 2019 Indictment Convictions.

    C.    The Aggravating Factors Did Not Justify The Lengthy Terms.

    D.    Count Four Should Have Been Merged Into Count One.

    1.    The Out-of-Court Identifications.

The identification of a defendant by a witness or victim is often highly persuasive evidence. The circumstances of an identification can, however, result in mistaken identifications. So, the New Jersey Supreme Court has established strict procedures for making and recording an identification. <u>See</u> <u>State v. Henderson</u>, 208 N.J. 208, 288-293 (2011) (citing <u>Manson v. Brathwaite</u>, 432 U.S. 98 (1977) and <u>State v. Madison</u>, 109 N.J. 223 (1988)) (revising the <u>Manson</u>/<u>Madison</u> framework for evaluating eyewitness identification evidence). When a defendant challenges an out-of-court identification, he or she has the initial burden "of showing some evidence of suggestiveness that could lead to a mistaken identification." <u>Id.</u> at 288. If a trial court grants an evidentiary

14 <span style="float:right">A-2266-21</span>

hearing, the State is required to offer proof that the identification procedures were reliable.  Id. at 289.

In making that reliability determination, courts consider both "system variables" and "estimator variables."  Id. at 289-292.  System variables are within the State's control and concern the way the police conduct an identification procedure.  Id. at 248-61.  So, system variables include considerations such as whether and to what extent police gave the witness pre-identification instructions; whether a show-up identification occurred within a reasonable period after the alleged crime; whether police cautioned the witness that the suspect may not be the culprit and that the witness should not feel compelled to make an identification; and whether the witness received any suggestive feedback before, during, or after the identification procedure.  Ibid.

Estimator variables, which are outside the State's control, concern the criminal event, the witness, or the suspect.  Id. at 261.  Estimator variables include factors such as stress; weapons focus; the duration of the witness' observation of the assailant; distance and lighting; characteristics of the witness that could impact the accuracy of the identification; the suspect's appearance, including whether a disguise was worn; racial bias; and the speed of the identification.  Id. at 261-72.

15

Show-up identifications involve a witness' review of a single suspect. Id. at 259. Generally, a show-up identification should occur at the crime scene or shortly thereafter. Ibid. Although the procedure is recognized as inherently suggestive, "the risk of misidentification is not heightened if a [show-up] is conducted immediately after the witnessed event, ideally within two hours[.]" Ibid. If the show-up procedure is used, law enforcement personnel "should instruct witnesses that the person they are about to view may or may not be the culprit." Id. at 261.

When reviewing the trial court's denial of a motion to suppress an out-of-court identification, we "determine whether the findings made could reasonably have been reached on sufficient credible evidence present in the record." State v. Wright, 444 N.J. Super. 347, 356 (App. Div. 2016). The "trial court's findings at the hearing on the admissibility of identification evidence are 'entitled to very considerable weight.'" Ibid. (quoting State v. Adams, 194 N.J. 186, 203 (2008)). "Appellate review of the trial court's application of the law to the facts, however, is plenary." Id. at 357 (citing State v. Coles, 218 N.J. 322, 342 (2014)).

Defendant moved to suppress the out-of-court identifications made by Zack, Jim, Kim, and Mack. The trial court determined that defendant was entitled to an evidentiary Wade hearing and then conducted that hearing pretrial.

16                                                                              A-2266-21

At the hearing, two police officers testified: Detective Patrick Yarrow and Sergeant Innocenzo Visceglia.

Detective Yarrow had interviewed each of the six people who were in the Sunset Motel room. The interviews of Zack, Jim, and Kim were conducted between 11:15 p.m. on January 4, 2019, and 2:00 a.m. on January 5, 2019. During those interviews, the detective showed each witness a photograph of the person who had been at the Popeye's restaurant.

Each of the identifications were video recorded and reviewed by the trial court. The witnesses were not given pre-identification instructions. Nevertheless, the court found that none of those witnesses were given impermissibly suggestive feedback before, during, or after the identifications.

Sergeant Visceglia interviewed Mack at the hospital while he was being treated for the gunshot wound to his leg. That interview was audio recorded. Mack described defendant to Sergeant Visceglia based upon his prior interactions with him. By that time, law enforcement had identified defendant, and he had been arrested. Mack was, therefore, shown a photograph of defendant and was able to identify defendant as Philly and the man who had shot him.

A-2266-21

Based on the evidence at the <u>Wade</u> hearing, the trial court found that defendant had not proven that there was a substantial likelihood of misidentification in any of the four identification proceedings. The court found the Detective and Sergeant credible and that the show-up identifications were "necessary based upon the circumstances that detectives were dealing with." In that regard, the court noted that at the time that Zack, Jim, and Kim were interviewed, defendant had not yet been arrested. Accordingly, the court found that all the show-up identifications were necessary and were not impermissibly suggestive. Moreover, the court examined each identification and found that each was reliable based on the totality of the circumstances.

Having reviewed the record, we discern no reversible error in the admission of the four out-of-court identifications. The court's findings concerning each identification are supported by substantial credible evidence. Moreover, the trial court applied the correct law in analyzing the fact it found.

2.    The Joinder of the Indictments.

The State moved to join the 2019 indictment, which charged offenses stemming from the events on January 4 and 5, 2019, with the 2020 indictment, which charged defendant with attempted witness tampering and bribery. The trial court determined that joinder was appropriate under <u>Rule</u> 3:7-6.

Alternatively, the trial court found that even if the indictments were not joined, under N.J.R.E. 404(b), the evidence of the charged offenses under each indictment would be admissible at the trial for the other indictment. Defendant argues that the trial court erred in granting the State's motion to join the indictments. Having analyzed the record and the law, we reject that argument.

Rule 3:15-1(a) states that "[t]he court may order [two] or more indictments or accusations tried together if the offenses . . . could have been joined in a single indictment or accusation." Rule 3:7-6 provides that:

> [t]wo or more offenses may be charged in the same indictment or accusation . . . if the offenses charged are of the same or similar character or are based on the same act or transaction or on [two] or more acts or transactions connected together or constituting parts of a common scheme or plan. Relief from prejudicial joinder shall be afforded as provided by [Rule] 3:15-2.

Rule 3:15-2(b) gives trial courts the discretion to order separate trials if joinder would unfairly prejudice a defendant. State v. Weaver, 219 N.J. 131, 148-49 (2014). Where a defendant "is prejudiced by a . . . joinder of offenses . . . the court may order an election or separate trials of counts . . . or direct other appropriate relief." R. 3:15-2(b).

The New Jersey Supreme Court has explained that these rules are designed to address the inherent

19

danger when several crimes are tried together, that the jury may use the evidence cumulatively; that is, that, although so much as would be admissible upon any one of the charges might not have persuaded them of the accused's guilt, the sum of it will convince them as to all.

[State v. Pitts, 116 N.J. 580, 601 (1989) (quoting United States v. Lotsch, 102 F.2d 35, 36 (2d Cir. 1939)).]

In addition, there is a risk that juries may use the evidence of another crime to conclude that a defendant has a criminal propensity. State v. P.S., 202 N.J. 232, 254-55 (2010). A propensity inference could lead the jury to "employ an entirely 'different . . . calculus of probabilities' to determine the defendant's guilt or innocence." State v. Stevens, 115 N.J. 289, 303 (1989) (quoting Edward Imwinkelried, The Need to Amend Federal Rule of Evidence 404(b): The Threat to the Future of the Federal Rules of Evidence, 30 VIII. L. Rev. 1465, 1487-89 (1985)).

"The test for assessing prejudice is 'whether, assuming the charges were tried separately, evidence of the offenses sought to be severed would be admissible under [N.J.R.E. 404(b)] in the trial of the remaining charges.'" State v. Sterling, 215 N.J. 65, 73 (quoting State v. Chenique-Puey, 145 N.J. 334, 341 (1996) (alternations in original)).

20

The New Jersey Supreme Court has established four factors to weigh when deciding if other crimes or evidence of bad acts are admissible under N.J.R.E. 404(b):

> (1) The evidence of the other crime must be admissible as relevant to a material issue; (2) It must be similar in kind and reasonably close in time to the offense charged; (3) The evidence of the other crime must be clear and convincing; and (4) The probative value of the evidence must not be outweighed by its apparent prejudice.
>
> [State v. Cofield, 127 N.J. 328, 338 (1992).]

In addition, the other evidence must also be "necessary as proof of the disputed issue." State v. Hernandez, 170 N.J. 106, 118-19 (2001).

The joinder of the 2019 and 2020 indictments in this matter was not a reversible error. The witness tampering charges were connected to the robbery and murder charges and vice versa. See R. 3:7-6. Moreover, the witness tampering charges demonstrated defendant's consciousness of guilt. "[E]vidence of threats made by a defendant to induce a witness not to testify is admissible because it illuminates the declarant's consciousness of guilt." State v. Goodman, 415 N.J. Super. 210, 232 (App. Div. 2010) (quoting State v. Buhl, 269 N.J. Super. 344, 364 (App. Div. 1994)). See also State v. Yough, 208 N.J. 385, 402 n. 9 (2011) (explaining that if the defendant threatens or intimidates a

21

witness, such conduct is admissible to demonstrate consciousness of guilt under N.J.R.E. 404(b)).  In addition, the evidence supporting the charges in each indictment would have been admissible at trial of the charges in the other indictment.  See N.J.R.E. 404(b).

Defendant argues that "the joinder of the indictments also required the irrelevant and highly prejudicial disclosure of evidence of [defendant's] pretrial incarceration."  The trial court, however, appropriately gave an in limine instruction, both at the time the evidence was introduced and in the final charge, that "[t]he mere fact that somebody is in custody does not mean that they are guilty of a crime or wrongdoing" and that the jury "may not speculate about the reasons, if any, for defendant's custodial status."  Accordingly, the prejudice that defendant might have experienced because of the introduction of the evidence was effectively ameliorated by the trial court's jury instructions.

Defendant also argues that "the trial court's analysis only considered whether the evidence supporting the 2019 Indictment could be admitted at a separate trial on the tampering charges, and not vice versa."  A review of the trial court's opinion rebuts that argument.  The trial court specifically addressed the admissibility of the witness tampering evidence for purposes of proving defendant's "identity, motive, lack of accident, and preparing and plan."

3.    The Denial of the Request for a Mistrial.

Defendant contends that the trial court erred in failing to grant a mistrial after Jim, one of the witnesses from the motel room, had an outburst on the stand.  Defendant argues that the trial court's failure to grant a mistrial deprived him of his right to due process and a fair trial.

Jim was in the motel room when defendant came into the room.  He had identified defendant on the night of the incident, and he also identified defendant at trial.  Defendant raised no objection to Jim's direct examination.  During cross-examination, Jim became frustrated with the questions being asked by defense counsel and began to use profanity.  At one point, Jim stated:  "Oh, f - - -, Yo.  This is f - - - - - -  f - - - it, bro."  He then followed up by stating:  "I don't do this shit."  At the end of defendant's cross-examination, the following exchange occurred:

> [Jim]:  What [are] you shaking your head about?
>
> Prosecutor:  [Jim].
>
> [Jim]:  Oh!  Well, this is f[- -]king -- oh, -- oh, my God, bro.
>
> Court:  Do you need a break, sir?
>
> [Jim]:  Yeah, I need a break!
>
> Prosecutor:  Judge -- Judge, I --

23

[Jim]:  I've been saying that!

Prosecutor:  -- I think we're -- I think we're wrapping up if we could just --

Court:  Okay.  All right.  Then, --

Prosecutor: -- if we could just ask --

Court:  -- stay in there -- stay in there for a couple --

[Jim]:  I mean, he's shaking his head and shit.  Yo, you're all some goofies, bro.

Court:  Stay in there for a couple more questions.

Defendant:  If you're going to rat, rat, right --

Defense Counsel:  Take it easy.

Defendant:  -- and maybe you --

Court Officer:  No, be quiet, Mr. Bracey.

[Jim]:  Right, what?

Defendant:  -- and -- and rat on the right person.

Defense Counsel:  Whoa, whoa, whoa, whoa.  Yo, whoa, whoa.

Prosecutor:  Easy

Court:  Easy

[Jim]:  Yo, what you --

24

Court:  [Jim], -- [Jim].

[Jim]:  Oh, bro, man.

Court:  Keep it down.

Court Officer:  Quiet in the Courtroom.

[Jim]:  Yo, am I going to -- yo, I -- I can't do this shit, bro.  Like --

Court:  Just a couple -- couple more questions.

[Jim]:  -- then hur -- yo, hurry up, man.  I didn't even want to f[- -]king be in this place.  Y'all f[- -]king goofy as hell.

Prosecutor:  All right, [Jim].

[Jim]:  Goofy ass n[- - - - -], you know?

Court:  Sir, ssh.  Let him -- let him finish the questions, then you'll get out of here.

Prosecutor:  [Jim], real quick.

[Jim]:  Oh, my god!

Defense counsel then asked several questions on re-cross examination:

Defense Counsel:  But that's not what you told the Detective back when he interviewed you originally right after the incident; is it?

[Jim]:  Bro, you know it's the man.  I know it's the man.

Court:  You have to answer --

[Jim]: Everybody in here --

Court: You have to answer his question, though.

[Jim]: -- knows it's the man. All right? Look, this is goofy, bro. You know, ev -- everyone said the same thing. Everybody going to say the same thing.

. . . .

Defense Counsel: That's not what you told the Detective immediately after you were interviewed after the incident; is it?

[Jim]: Maybe 'cause my mind was probably 100 -- going 100,000 miles an hour.

Defense Counsel: You didn't tell the Detective that, either; did you? Did you ask the Detective, --

[Jim]: Bro, --

Defense Counsel: -- hey, listen, you know, I don't want to talk right now. I can come back. Give me a couple of hours?

[Jim]: Oh.

Defense Counsel: These are your own words, right, [Jim]? You said, "I'm not -- I don't know, but it could be him, right?"

[Jim]: It's him.

Defense Counsel: But, that's not what you said.

[Jim]: Yes, I said that back then; but, it's him. F[- -]k, I just -- yo, you're all f[- -]king --

26

Court: Sir, compose yourself.

Prosecutor:  I think he's answered the question, Judge.

Court:  He's answered the question.

[Jim]:  Thank you.  Started asking it different --

Prosecutor:  Okay.

[Jim]: -- type of f[- -]king ways and shit.  I just told him!

Prosecutor:  [Jim], I understand.

Defense Counsel:  Judge, --

Court:  Any -- any additional questions by the State?

Prosecutor:  No.

Court:  Any additional questions by the defense?

Defense Counsel:  No, thanks.

Court:  Done?  He's excused.

Prosecutor:  Yeah.  [Jim], nice and easy.  Go outside and he'll take you home.

[Jim]:  Oh, all right.  Well, it's bullshit.  You must be feeling real good about --

Prosecutor:  Take -- take it easy.

[Jim]:  -- your job, too.

A-2266-21

Court Officer: You got to be quiet.

Jim then left the courtroom. Defense counsel did not initially raise an objection. Nor did the trial court address Jim's outburst with the jury. Instead, the State called another witness and the testimony for that day ended.

The following morning, defense counsel moved for a mistrial contending that Jim's outburst prejudiced the jury. After considering defense counsel and the State's arguments, the trial court reasoned that Jim's comments were not responsive to any question and illustrated his frustration because Jim had "just broke" under cross-examination. The trial court, therefore, denied the motion for a mistrial and gave a curative instruction to the jury. That instruction included the following directions:

> Yesterday we heard from a witness, [Jim]. As you recall, he testified on direct and on cross, and redirect, recross. And at the very end of his testimony, he became emotional. He showed some passion. He showed a lack of decorum, and he became unhinged.
>
> His testimony when he testified is still for you to determine what is evidence, what is not evidence, what is credible, what is not credible.
>
> My instruction now, though, is to have you ignore the last [thirty] seconds or so of his behavior and his testimony. That was not evidence. Okay. You're here to decide the case based on evidence. That was not evidence. That was emotion.

And he had an exchange, either with [defendant], and [defendant] had a short exchange back. He may -- I don't recall exactly what he said, but he also may have said something to [defendant's] counsel on his way out the door.

Again, that is not testimony. That was not solicited by the State or the Defense. That was unsolicited. It is not testimony. It is not to be considered by you during your deliberations.

The trial court gave a similar instruction in his final charge to the jury, again instructing them to disregard any emotional or unsolicited comments by Jim.

A trial court's denial of a motion for a mistrial is reviewed for an abuse of discretion and will only be reversed if the denial resulted in a "manifest injustice." State v. Herbert, 457 N.J. Super. 490, 503 (App. Div. 2019) (quoting State v. Harvey, 151 N.J. 117, 205 (1997)). In considering an application for a mistrial, a court should "consider the unique circumstances of the case," and reject the mistrial application in favor of an "'appropriate alternative course of action,'" such as a curative instruction. State v. Smith, 224 N.J. 36, 47 (2016) (quoting State v. Allah, 170 N.J. 269, 280-81 (2002)).

When inadmissible evidence is presented to a jury, a trial court must decide whether that evidence "'is of such a nature as to be susceptible of being cured by a cautionary or limiting instruction, or instead requires the more severe response of a mistrial.'" Herbert, 457 N.J. Super. at 502-03 (quoting State v.

<u>Winter</u>, 96 N.J. 640, 646-47 (1984)).  In determining whether a curative instruction provided an appropriate alternative to a mistrial, appellate courts evaluate the adequacy of the instruction in light of the nature of the prejudicial effect of the offending evidence, the timing and substance of the instruction, and the extent of the risk that the jury will not comply with the instruction.  <u>Id.</u> at 505-08.

"The determination of whether the appropriate response is a curative instruction, as well as the language and detail of the instruction, is within the discretion of the trial judge 'who has the feel of the case and is best equipped to gauge the effect of a prejudicial comment on the jury in the overall setting.'" <u>State v. Wakefield</u>, 190 N.J. 397, 486 (2007) (quoting <u>Winter</u>, 96 N.J. at 647) (additional citations omitted).  These principles have been applied by our Supreme Court in evaluating an inappropriate outburst by a witness.  <u>See</u> <u>State v. Harris</u>, 156 N.J. 122, 174-76 (1998).  In <u>Harris</u>, the witness made a statement to the defendant while counsel and the trial judge were conducting a sidebar. The witness turned towards the defendant and stated:  "Murderer.  I hope they kill your ass[.]"  <u>Id.</u> at 174.  In response, the defendant mouthed back the word "bitch."  <u>Ibid.</u>  When the comments were brought to the court's attention, the trial judge asked the jurors if they had heard the witness' comment directed at

the defendant.  <u>Ibid.</u>  Most of the jurors responded that they had.  <u>Ibid.</u>  The court then immediately instructed the jury to ignore the comment.  <u>Ibid.</u>

Several days later, defense counsel requested that the court ask the jurors whether they had heard defendant's response to the witness' statement.  <u>Ibid.</u> The court questioned the jury as a group, but no juror indicated that they had heard defendant's response.  <u>Ibid.</u>

The defendant in <u>Harris</u> then moved for a mistrial.  <u>Id.</u> at 174-75.  The trial court denied the motion finding that the witness' comment reflected poorly on her rather than defendant.  <u>Ibid.</u>  In his final instruction to the jury, the court again told the jury to ignore any improper remarks from the witness.  <u>Id.</u> at 175. On appeal, the Supreme Court affirmed.  <u>Id.</u> at 176.  The Court reasoned that because the comments were brief and in accordance with the witness' testimony, the trial court's instruction that they were improper and should be ignored was an appropriate response.  <u>Id.</u> at 175-76.

Here, like the witness in <u>Harris</u>, Jim's use of profanity and comments were not unduly prejudicial to defendant's case.  The profanity was more likely to reflect poorly on Jim.  His comments that everyone knew defendant was the person in the motel room were consistent with his admissible testimony.  Most importantly, the trial court's instructions to the jury to disregard Jim's emotional

31

outburst were sufficient because juries are presumed to follow the instructions of the court.  State v. Miller, 205 N.J. 109, 126 (2011).

Defendant argues that the trial court abused its discretion by not giving the initial instruction until the following day.  The record, however, establishes that defense counsel only raised the issue the following day.  At that point, the court gave an appropriate and forceful instruction, and we discern no reversible error in the relatively short delay.

Defendant also contends that the trial court's instruction was inadequate because the court only instructed the jury to disregard the final thirty seconds of Jim's testimony and not all the outbursts.  A review of the instruction given during trial and again in the final instructions establishes that the trial judge told the jury to disregard all "emotional statements" and all statements "not solicited by the State or the Defense."  Accordingly, considered in full context, we discern no abuse of discretion in the trial court's denial of defendant's request for a mistrial.

4.    The Jury Instruction On Unanimity.

In his fourth argument, defendant contends that the instructions on three of the charges did not inform the jury that it had to be unanimous as to the victim of the crimes.  Specifically, defendant asserts that count six of the 2019

indictment, concerning the first-degree robbery related to the motel, and counts one and two of the 2020 indictment, charging first and second-degree attempted witness tampering, did not contain a specific unanimity instruction. A review of the evidence supporting the State's charges and the instructions given by the trial court does not support defendant's argument.

A jury must reach a unanimous verdict in a criminal case. See N.J. Const. art. I, ¶ 9; R. 1:8-9. To be unanimous, jurors must "'be in substantial agreement as to just what a defendant did' before determining his or her guilt or innocence." State v. Macchia, 253 N.J. 232, 252-53 (2023) (citing State v. Frisby, 174 N.J. 583, 596 (2002)); see also Ramos v. Louisiana, 590 U.S. 83, 92 (2020) (recognizing that "a defendant enjoys a 'constitutional right to demand that his liberty should not be taken from him except by the joint action of the court and the unanimous verdict of a jury of twelve persons'").

"Ordinarily, a general instruction on the requirement of unanimity suffices to instruct the jury that it must be unanimous on whatever specifications it finds to be the predicate of a guilty verdict." State v. Cagno, 211 N.J. 488, 516-17 (2012) (quoting State v. Parker, 124 N.J. 628, 641 (1991)). An unanimity instruction, however, is required "in cases where there is a danger of a fragmented verdict." Id. at 517 (citing Frisby, 174 N.J. at 597-98). Moreover,

"[a]lthough [an unanimity] charge should be granted on request, in the absence of a specific request, the failure to so charge does not necessarily constitute reversible error." Parker, 124 N.J. at 637. Parker set forth a two-prong test that courts use when evaluating the necessity of a specific unanimity instruction. Cagno, 211 N.J. at 517. Those two prongs are: whether the acts alleged are conceptually similar or are "contradictory or only marginally related to each other[,]" and whether there is "tangible indication of jury confusion." Id. at 517-18.

In count six of the 2019 indictment, defendant was charged with robbery "of the occupants of [R]oom 18 at the Sunset Motel." The individual occupants were not named in the indictment. In its final instruction on that charge, the trial court used the Model Criminal Jury Charge and instructed the jury that to find defendant guilty of robbery related to the motel, the State was required to prove beyond a reasonable doubt that:

> Defendant was in the course of committing a theft [and] while in the course of committing a theft, [] defendant (a) knowingly inflicted bodily injury or used force upon another; (b) threatened another with, or purposely put him or her in fear of…immediate bodily injury; and (c) committed or threatened immediately to commit…[the crime of] first-degree murder, second-degree possession of a weapon for unlawful purpose, or second-degree unlawful possession of a weapon without a permit.

34

Defendant did not object to that instruction either at the charge conference or after it was given. Accordingly, we review this issue for plain error. In the context of jury instructions, plain error is "legal impropriety in the charge prejudicially affecting the substantial rights of the defendant sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." Adams, 194 N.J. at 207 (alterations in original) (quoting State v. Jordon, 147 N.J. 409, 422 (1997)).

The evidence in support of the motel robbery demonstrated a continuous course of criminal conduct against all the occupants of the room. The evidence demonstrated that defendant forced his way into the room, shot one of the occupants, threatened the other occupants in the room, including the baby, and demanded money. That evidence did not present circumstances where jurors would disagree on the theory of the robbery. Indeed, because the jury also found that defendant was guilty of aggravated manslaughter of one of the occupants, it clearly and unanimously found that defendant knowingly inflicted bodily injury while committing the theft.

In counts one and two of the 2020 indictment, defendant was charged with "attempting to tamper with [a] witness" and "attempt[ing] to commit the crime

35

of bribery, specifically by agreeing to confer upon a witness a benefit in consideration of withholding testimony or information." In instructing the jury on those charges, the trial court used the Model Criminal Jury charges. Thus, on the attempted witness tampering charge, the jury was instructed that the State was required to prove beyond a reasonable doubt that "defendant believed that an official proceeding or investigation was pending or about to be instituted or ha[d] been instituted" and "defendant knowingly engaged in conduct which a reasonable person would believe would cause a witness or informant to withhold any testimony, information, or document or thing." In the instruction for attempted tampering of a witness by bribery, the court directed the jury, again in accordance with the Model Criminal Jury Charges, that the State was required to prove beyond a reasonable doubt that "defendant directly or indirectly offers, confers, agrees, or agrees to confer a benefit on another person," "the benefit was to be offered or conferred upon a witness," and "defendant engaged in conduct which a reasonable person would believe to cause a witness or informant to withhold testimony, information, document, or thing."

Again, defendant did not object to those charges. Indeed, defendant did not object during the charge conference or after the charges were given to the jury.

A-2266-21

At trial, the State presented evidence that defendant committed one act of tampering against all victims by writing letters to Fersner and asking him to threaten or bribe the witnesses not to appear in court and not to testify. Consequently, because defendant did not request the specific unanimity charge, and because there were no separate acts alleged to have been committed against separate victims, there was no danger of a fragmented verdict.

In making his argument on this point, defendant relies on State v. Gentry, 183 N.J. 30 (2005). That reliance is misplaced. In Gentry, the defendant was charged with robbery of a Rite-Aid by use of force against an employee "and/or" the manager. Id. at 31. The State presented evidence that the defendant knocked into an employee in the store while fleeing with stolen items. There was also evidence that the defendant assaulted the manager outside the store when the manager attempted to stop defendant from leaving. Ibid.

During deliberations, the jury sent a note to the judge stating that all the jurors agreed that the defendant had used force against someone, but some jurors believed he had used force against only the manager and others believed that he had used force against only the employee. Id. at 31-23. The jury asked if that was a unanimous verdict. Id. at 32. The trial court ruled that it was. Ibid. The

Supreme Court reversed, holding that the jury had to be unanimous as to which victim the defendant had used force against. Id. at 33.

In contrast to this case, Gentry dealt with the answer to a question from the jury that clearly indicated confusion. Here, there were no contradictory theories under which the jury could have convicted defendant and there was no indication of confusion by the jury.

5.    Defendant's Request for A Third-Party Guilt Charge.

Before the court issued its final instruction to the jury, defendant requested that the court include a third-party guilt charge. Defense counsel argued that the testimony by B.B. supported that charge. In that regard, B.B. had testified that he arranged for defendant to buy a gun from an unidentified person on the evening of January 4 of an unknown year.

A defense can include evidence of third-party guilt. State v. Cope, 224 N.J. 530, 551 (2016). In that regard, a defendant is entitled to show that someone else committed the crime provided there is some evidence of the involvement of a third party. State v. Jimenez, 175 N.J. 475, 486 (2003).

"Third-party-guilt evidence is admissible so long as 'the proof offered has a rational tendency to engender a reasonable doubt with respect to an essential feature of the State's case.'" State v. Hannah, 248 N.J. 148, 181 (2021) (citing

State v. Perry, 225 N.J. 222, 238 (2016)). The evidence must be based on "specific evidence linking the third-person to the crime[.]" Ibid. (citing State v. Timmendequas, 161 N.J. 515, 620 (1999))

In considering whether to charge a jury on third-party guilt, the trial court should engage in a fact-sensitive analysis to determine whether the evidence of third-party guilt meets the appropriate level of reliability. State v. Cotto, 182 N.J. 316, 333 (2005). In making that determination, the trial court has broad discretion to admit or preclude evidence of third-party guilt. Ibid. See also State v. Sturdivant, 31 N.J. 165, 179 (1959) (explaining that the "question of relevance ultimately rests in a sound exercise of discretion") (internal citations omitted).

In considering defendant's request for a third-party guilt charge, the trial court carefully analyzed the testimony provided by B.B. The court pointed out several inconsistencies in B.B.'s testimony and found that there were "a lot of unknowns about" when and how the gun transaction occurred. Ultimately, the trial court found that it would be confusing to provide a third-party guilt charge but allowed defendant's counsel to argue a third-party defense to the jury.

We discern no abuse of discretion and no reversible error in that decision. A review of B.B.'s testimony supports the trial court's findings that it was not consistent enough to warrant a charge from the court. According to B.B., the

gun transaction took place sometime after 10:30 p.m. on an unidentified night. Even if that night was January 4, 2019, defendant had already been at the motel and the Popeye's restaurant before the alleged gun transaction. Therefore, the shooting and aggravated assault would have already occurred. Just as importantly, the trial court was very clear in instructing the jury that it must find beyond a reasonable doubt that the defendant was the person committing the alleged crimes. The court was also clear in instructing the jury that defendant had no obligation to prove anything or present any evidence, including the identity of the person who committed the crime. In short, reviewed in full context, there was no reversible error in the court's decision not to give a third-party guilt charge.

6. The Sentences.

In his final point, defendant argues that the trial court erred in several different ways in sentencing him. Specifically, defendant argues that the trial court (1) erred in imposing consecutive prison terms; (2) failed to appropriately consider the overall fairness of the sentence; and (3) imposed an excessive sentence. Defendant also argues that he was not provided with an opportunity to allocate before his sentencing. Finally, he contends that count four should

have merged with the related robbery count in count one. We reject these arguments except for the last one.

An appellate court's standard of review of a sentence is well-established and deferential. State v. Cuff, 239 N.J. 321, 347 (2019) (citing State v. Fuentes, 217 N.J. 57, 70 (2014)). We will affirm a trial court's sentence unless: "(1) the sentencing guidelines were violated; (2) the findings of aggravating and mitigating factors were not 'based upon competent credible evidence in the record;' or (3) 'the application of the guidelines to the facts' of the case 'shock[s] the judicial conscience.'" State v. Bolvito, 217 N.J. 221, 228 (2014) (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).

Our review of the sentencing transcripts and the related record satisfies us that the trial court appropriately considered and imposed consecutive terms. In that regard, the court analyzed the evidence of the four separate incidences that gave rise to defendant's seventeen criminal convictions. The court then discussed and analyzed the appropriate factors to be considered in imposing consecutive sentences. See N.J.S.A. 2C:44-5(a); Cuff, 239 N.J. at 348; Yarbough, 100 N.J. at 642-44.

We also reject defendant's argument that the sentences imposed were excessive. The sentencing court found aggravating factors three, six, and nine

and found that no mitigating factors applied. The court accordingly found that the aggravating factors predominated over the lack of mitigating factors. We find no abuse of discretion in that determination.

In addition, we reject defendant's argument that the trial court failed to consider the overall fairness of the sentence imposed. The record establishes that the court expressly considered the overall fairness and provided a detailed analysis of why it was imposing the lengthy sentences. See State v. Torres, 246 N.J. 246, 273-74 (2021). In affirming the sentences, we recognize that ninety-eight years in prison, with over eighty years of parole ineligibility, is effectively a life sentence for defendant. Nevertheless, the trial court conducted the appropriate analysis of all the relevant factors, and we cannot say the court abused its discretion or committed reversable error.

In terms of the allocution, defendant correctly points out that the sentencing court did not initially ask him if he wanted to make a statement. Nevertheless, after announcing defendant's sentences, but before concluding the sentencing hearing, defendant was given an opportunity to address the court. When asked if he had anything to say, defendant responded: "I'll see y'all in the next go around." Accordingly, we discern no reversible error concerning the allocution.

We do discern an error in the sentencing court's decision to merge count three (the conviction for unlawful possession of a weapon) into count four (the conviction for possession of a weapon for an unlawful purpose). The conviction for possession of a weapon without a permit does not merge with a conviction for possession of the same weapon for an unlawful purpose. See State v. Basit, 378 N.J. Super. 125, 128 (App. Div. 2005); see also State v. O'Neill, 193 N.J. 148, 163 n. 8 (2007). Accordingly, we remand for resentencing on counts three and four. At the resentencing hearing, the trial court shall merge count four into the related robbery conviction under count one. The court is then to impose a sentence on count three. In imposing that sentence, however, the sentence should be run concurrent to defendant's other sentences because that is what the court did in imposing the sentence on count four. Defendant should not receive a higher overall sentence because of his appeal. See State v. Kashi, 180 N.J. 45, 49 (2004) (citing State v. De Bonis, 58 N.J. 182, 188-89 (1971)).

III.

Having reviewed all of defendant's arguments, we affirm his convictions. We also affirm his sentences, except for the merger of count three into count four. We remand for the limited purpose of correcting the sentences on those two convictions.

43

Affirmed in part, reversed in part, and remanded.  We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-2266-21